## WEISS *v.* UNITED STATES

No. 92–1482.   Argued November 3, 1993—Decided January 19, 1994*

*Together with *Hernandez* v. *United States,* also on certiorari to the same court (see this Court's Rule 12.2).

164

REHNQUIST, C. J., delivered the opinion of the Court, in which BLACK-MUN, STEVENS, O'CONNOR, KENNEDY, SOUTER, and GINSBURG, JJ., joined, and in which SCALIA and THOMAS, JJ., joined as to Parts I and II–A. SOUTER, J., filed a concurring opinion, *post*, p. 182. GINSBURG, J., filed a concurring opinion, *post*, p. 194. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in which THOMAS, J., joined, *post*, p. 195.

*Alan B. Morrison* argued the cause for petitioners. With him on the briefs were *Philip D. Cave, Dwight H. Sullivan, Eugene R. Fidell,* and *Ronald W. Meister.*

*Solicitor General Days* argued the cause for the United States. With him on the brief were *Acting Assistant At-*

*torney General Keeney, Deputy Solicitor General Bryson, Paul J. Larkin, Jr., Thomas E. Booth, Theodore G. Hess, and Albert Diaz.†*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We must decide in these cases whether the current method of appointing military judges violates the Appointments Clause of the Constitution, and whether the lack of a fixed term of office for military judges violates the Fifth Amendment's Due Process Clause. We conclude that neither constitutional provision is violated.

Petitioner Weiss, a United States Marine, pleaded guilty at a special court-martial to one count of larceny, in violation of Article 121 of the Uniform Code of Military Justice (UCMJ or Code), 10 U. S. C. § 921. He was sentenced to three months of confinement, partial forfeiture of pay, and a bad-conduct discharge. Petitioner Hernandez, also a Marine, pleaded guilty to the possession, importation, and distribution of cocaine, in violation of Article 112a, UCMJ, 10 U. S. C. § 912a, and conspiracy, in violation of Article 81, UCMJ, 10 U. S. C. § 881. He was sentenced to 25 years of confinement, forfeiture of all pay, a reduction in rank, and a dishonorable discharge. The convening authority reduced Hernandez' sentence to 20 years of confinement.

The Navy-Marine Corps Court of Military Review, in separate appeals, affirmed petitioners' convictions. The Court of Military Appeals granted plenary review in petitioner Weiss' case to address his contention that the judges in his case had no authority to convict him because their appointments violated the Appointments Clause, and their lack of a

---

†Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *David B. Isbell, John Vanderstar, David H. Resnicoff, Steven R. Shapiro,* and *Arthur B. Spitzer;* and for the United States Air Force Appellate Defense Division by *Robert I. Smith, Jay L. Cohen,* and *Frank J. Spinner.*

fixed term of office violated the Due Process Clause. Relying on its recent decision in *United States* v. *Graf,* 35 M. J. 450 (1992), cert. pending, No. 92–1102, in which the court unanimously held that due process does not require military judges to have a fixed term of office, the court rejected Weiss' due process argument. 36 M. J. 224, 235, n. 1 (1992). In a splintered decision, the court also rejected petitioner's Appointments Clause challenge.

Two of the five judges concluded that the initial appointment of military trial and appellate judges as commissioned officers is sufficient to satisfy the Appointments Clause. *Id.,* at 225–234 (plurality opinion). A separate appointment before taking on the duties of a military judge is unnecessary, according to the plurality, in part because the duties of a judge in the military justice system are germane to the duties that military officers already discharge. *Ibid.* One judge concurred in the result only, concluding that the Appointments Clause does not apply to the military. *Id.,* at 234–240 (opinion of Crawford, J.). The other two judges dissented separately. Both stressed the significant changes brought about by the Military Justice Act of 1968, particularly the duties added to the newly created office of military judge, and both concluded that the duties of a military judge are sufficiently distinct from the other duties performed by military officers to require a second appointment. See *id.,* at 240–256 (Sullivan, C. J., dissenting), and *id.,* at 256–263 (Wiss, J., dissenting).

The Court of Military Appeals accordingly affirmed petitioner Weiss' conviction. Based on its decision in *Weiss,* the court, in an unpublished opinion, also affirmed petitioner Hernandez' conviction. Judgt. order reported at 37 M. J. 252 (1993). Weiss and Hernandez then jointly petitioned for our review, and we granted certiorari. 508 U. S. 939 (1993).

It will help in understanding the issues involved to review briefly the contours of the military justice system and the role of military judges within that system. Pursuant to Ar-

ticle I of the Constitution, Congress has established three tiers of military courts. See U. S. Const., Art. I, §8, cl. 14. At the trial level are the courts-martial, of which there are three types: summary, special, and general. The summary court-martial adjudicates only minor offenses, has jurisdiction only over servicemembers, and can be conducted only with their consent. It is presided over by a single commissioned officer who can impose up to one month of confinement and other relatively modest punishments. Arts. 16(3), 20, UCMJ, 10 U. S. C. §§816(3), 820.

The special court-martial usually consists of a military judge and three court-martial members,[1] although the Code allows the members to sit without a judge, or the accused to elect to be tried by the judge alone. Art. 16(2), UCMJ, 10 U. S. C. §816(2). A special court-martial has jurisdiction over most offenses under the UCMJ, but it may impose punishment no greater than six months of confinement, three months of hard labor without confinement, a bad-conduct discharge, partial and temporary forfeiture of pay, and a reduction in grade. Art. 19, UCMJ, 10 U. S. C. §819. The general court-martial consists of either a military judge and at least five members, or the judge alone if the accused so requests. Art. 16(1), UCMJ, 10 U. S. C. §816(1). A general court-martial has jurisdiction over all offenses under the UCMJ and may impose any lawful sentence, including death. Art. 18, UCMJ, 10 U. S. C. §818.

The military judge, a position that has officially existed only since passage of the Military Justice Act of 1968, acts as presiding officer at a special or general court-martial. Art. 26, UCMJ, 10 U. S. C. §826. The judge rules on all legal questions, and instructs court-martial members regarding the law and procedures to be followed. Art. 51, UCMJ,

---

[1] Court-martial members may be officers or enlisted personnel, depending on the military status of the accused; the members' responsibilities are analogous to, but somewhat greater than, those of civilian jurors. See Art. 25, UCMJ, 10 U. S. C. §825.

10 U. S. C. § 851. The members decide guilt or innocence and impose sentence unless, of course, the trial is before the judge alone. *Ibid.* No sentence imposed becomes final until it is approved by the officer who convened the court-martial. Art. 60, UCMJ, 10 U. S. C. § 860.

Military trial judges must be commissioned officers of the Armed Forces[2] and members of the bar of a federal court or a State's highest court. Art. 26, UCMJ, 10 U. S. C. § 826. The judges are selected and certified as qualified by the Judge Advocate General of their branch of the Armed Forces.[3] They do not serve for fixed terms and may perform judicial duties only when assigned to do so by the appropriate Judge Advocate General. While serving as judges, officers may also, with the approval of the Judge Advocate General, perform other tasks unrelated to their judicial duties. *Ibid.* There are approximately 74 judges currently certified to preside at general and special courts-martial. An additional 25 are certified to preside only over special courts-martial.

At the next tier are the four Courts of Military Review, one each for the Army, Air Force, Coast Guard, and Navy-Marine Corps. These courts, which usually sit in three-judge panels, review all cases in which the sentence imposed is for one or more years of confinement, involves the dismissal of a commissioned officer, or involves the punitive discharge of an enlisted servicemember. Art. 66, UCMJ, 10 U. S. C. § 866. The courts may review *de novo* both factual and legal findings, and they may overturn convictions and sentences. *Ibid.*

---

[2] All commissioned officers are appointed by the President, with the advice and consent of the Senate. 10 U. S. C. § 531.

[3] The Judge Advocate General for each service is the principal legal officer for that service. See 10 U. S. C. § 3037 (Army), § 5148 (Navy-Marine Corps), § 8037 (Air Force); Art. 1(1), UCMJ, 10 U. S. C. § 801(1) (Coast Guard).

Appellate judges may be commissioned officers or civilians, but each must be a member of a bar of a federal court or of a State's highest court. *Ibid.* The judges are selected and assigned to serve by the appropriate Judge Advocate General. *Ibid.* Like military trial judges, appellate judges do not serve for a fixed term. There are presently 31 appellate military judges.

Atop the system is the Court of Military Appeals, which consists of five civilian judges who are appointed by the President, with the advice and consent of the Senate, for fixed terms of 15 years. Arts. 67, 142, UCMJ, 10 U. S. C. §§ 867, 942 (1988 ed., Supp. IV). The appointment and tenure of these judges are not at issue here.

## I

The Appointments Clause of Article II of the Constitution reads as follows:

> "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U. S. Const., Art. II, § 2, cl. 2.

We begin our analysis on common ground. The parties do not dispute that military judges, because of the authority and responsibilities they possess, act as "Officers" of the United States. See *Freytag* v. *Commissioner,* 501 U. S. 868 (1991) (concluding special trial judges of Tax Court are officers); *Buckley* v. *Valeo,* 424 U. S. 1, 126 (1976) ("[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must,

therefore, be appointed in the manner prescribed by [the Appointments Clause]"). The parties are also in agreement, and rightly so, that the Appointments Clause applies to military officers. As we said in *Buckley,* "*all* officers of the United States are to be appointed in accordance with the Clause. . . . No class or type of officer is excluded because of its special functions." *Id.,* at 132 (emphasis in original).

It follows that those serving as military judges must be appointed pursuant to the Appointments Clause. All of the military judges involved in these cases, however, were already commissioned officers when they were assigned to serve as judges,[4] and thus they had already been appointed by the President with the advice and consent of the Senate.[5] The question we must answer, therefore, is whether these officers needed another appointment pursuant to the Appointments Clause before assuming their judicial duties. Petitioners contend that the position of military judge is so different from other positions to which an officer may be assigned that either Congress has, by implication, required a second appointment, or the Appointments Clause, by constitutional command, requires one. We reject both of these arguments.

Petitioners' argument that Congress by implication has required a separate appointment is based in part on the fact that military judges must possess certain qualifications, in-

---

[4] The constitutionality of the provision allowing civilians to be assigned to Courts of Military Review, without being appointed pursuant to the Appointments Clause, obviously presents a quite different question. See Art. 66(a), UCMJ, 10 U. S. C. § 866(a). It is not at issue here.

[5] Although the record before us does not contain complete information regarding the military careers of the judges involved in these cases, it is quite possible that they had been appointed more than once before being detailed or assigned to serve as military judges. This is because 10 U. S. C. § 624 requires a new appointment by the President, with the advice and consent of the Senate, each time a commissioned officer is promoted to a higher grade—*e. g.,* if a captain is promoted to major, he must receive another appointment.

cluding membership in a state or federal bar. But such special qualifications in themselves do not, we believe, indicate a congressional intent to create a separate office. Special qualifications are needed to perform a host of military duties; yet no one could seriously contend that the positions of military lawyer or pilot, for example, are distinct offices because officers performing those duties must possess additional qualifications.

Petitioners' argument also ignores the fact that Congress has not hesitated to expressly require the separate appointment of military officers to certain positions. An additional appointment by the President and confirmation by the Senate is required for a number of top-level positions in the military hierarchy, including: the Chairman and Vice Chairman of the Joint Chiefs of Staff, 10 U. S. C. §§ 152, 154; the Chief and Vice Chief of Naval Operations, §§ 5033, 5035; the Commandant and Assistant Commandant of the Marine Corps, §§ 5043, 5044; the Surgeons General of the Army, Navy, and Air Force, §§ 3036, 5137, 8036; the Chief of Naval Personnel, § 5141; the Chief of Chaplains, § 5142; and the Judge Advocates General of the Army, Navy, and Air Force, §§ 3037, 5148, 8037.

With respect to other positions, however, Congress has spoken quite differently. The Deputy and Assistant Chiefs of Staff for the Army, for example, are "general officers *detailed* to these positions." § 3035 (emphasis added). The Chief of Staff of the Marine Corps and his assistants are "detailed" to those positions by the Secretary of the Navy. § 5045. Commissioned officers "may be detailed for duty" with the American Red Cross by the appropriate military Secretary. § 711a. Secretaries of military departments "may assign or detail members of the armed forces" to be inspectors of buildings owned or occupied abroad by the United States. § 713. The Secretary of the Navy "may assign" enlisted members of the Navy to serve as custodians of foreign embassies and consulates. § 5983. And the Pres-

ident may "detail" officers of the Navy to serve as superintendents or instructors at nautical schools. This contrasting treatment indicates rather clearly that Congress repeatedly and consistently distinguished between an office that would require a separate appointment and a position or duty to which one could be "assigned" or "detailed" by a superior officer.

The sections of the UCMJ relating to military judges speak explicitly and exclusively in terms of "detail" or "assign"; nowhere in these sections is mention made of a separate appointment. Section 826(a) provides that a military judge shall be "detail[ed]" to each general court-martial, and may be "detail[ed]" to any special court-martial. The military judge of a general court-martial must be designated by the Judge Advocate General, or his designee, § 826(c), but the appropriate Service Secretary prescribes by regulation the manner in which military judges are detailed for special courts-martial, and what persons are authorized to so detail them. Section 866, in turn, provides that military appellate judges shall be "assigned to a Court of Military Review." The appropriate Judge Advocate General designates a chief judge for each Court of Military Review, and the chief judge determines "on which panels of the court the appellate judges *assigned* to the court will serve and which military judge *assigned* to the court will act as the senior judge on each panel." *Ibid.* (emphasis added).

Congress' treatment of military judges is thus quite different from its treatment of those offices, such as Chairman of the Joint Chiefs of Staff, for which it wished to require a second appointment before already-commissioned officers could occupy them. This difference negates any permissible inference that Congress intended that military judges should receive a second appointment, but in a fit of absentmindedness forgot to say so.

Petitioners' alternative contention is that even if Congress did not intend to require a separate appointment for a mili-

tary judge, the Appointments Clause requires such an appointment by its own force. They urge upon us in support of this contention our decisions in *Buckley* v. *Valeo*, 424 U. S. 1 (1976), *Freytag* v. *Commissioner*, 501 U. S. 868 (1991), and *Morrison* v. *Olson*, 487 U. S. 654 (1988). These decisions undoubtedly establish the analytical framework upon which to base the conclusion that a military judge is an "officer of the United States"—a proposition to which both parties agree. But the decisions simply do not speak to the issue of whether, and when, the Appointments Clause may require a second appointment.

The lead and dissenting opinions in the Court of Military Appeals devoted considerable attention to, and the parties before us have extensively briefed, the significance of our opinion in *Shoemaker* v. *United States*, 147 U. S. 282 (1893). There Congress had enacted a statute establishing a commission to supervise the development of Rock Creek Park in the District of Columbia. Three of the members were appointed by the President with the advice and consent of the Senate, but the remaining two members were the Chief of Engineers of the Army and the Engineer Commissioner of the District of Columbia. Both of the latter were already commissioned as military officers, but it was contended that the Appointments Clause required that they again be appointed to their new positions. The Court rejected the argument, saying:

> "[T]he argument is, that while Congress may create an office, it cannot appoint the officer; that the officer can only be appointed by the President with the approval of the Senate. . . . As, however, the two persons whose eligibility is questioned were at the time of the passage of the act . . . officers of the United States who had been theretofore appointed by the President and confirmed by the Senate, we do not think that, because additional duties, germane to the offices already held by them, were devolved upon them by the act, it was necessary

that they should be again appointed by the President and confirmed by the Senate. It cannot be doubted, and it has frequently been the case, that Congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed." *Id.*, at 300–301.

The present cases before us differ from *Shoemaker* in several respects, at least one of which is significant for purposes of Appointments Clause analysis. In *Shoemaker*, Congress assigned new duties to two existing offices, each of which was held by a single officer. This no doubt prompted the Court's description of the argument as being that "while Congress may create an office, it cannot appoint the officer." By looking to whether the additional duties assigned to the offices were "germane," the Court sought to ensure that Congress was not circumventing the Appointments Clause by unilaterally appointing an incumbent to a new and distinct office. But here the statute authorized an indefinite number of military judges, who could be designated from among hundreds or perhaps thousands of qualified commissioned officers. In short, there is no ground for suspicion here that Congress was trying to both create an office and also select a particular individual to fill the office. Nor has Congress effected a "diffusion of the appointment power," about which this Court expressed concern in *Freytag, supra*, at 878.

Even if we assume, *arguendo*, that the principle of "germaneness" applies to the present situation, we think that principle is satisfied here. By enacting the Uniform Code of Military Justice in 1950, and through subsequent statutory changes, Congress has gradually changed the system of military justice so that it has come to more closely resemble the civilian system. But the military in important respects remains a "specialized society separate from civilian society," *Parker* v. *Levy*, 417 U. S. 733, 743 (1974). Although military

judges obviously perform certain unique and important functions, all military officers, consistent with a long tradition, play a role in the operation of the military justice system.

Commissioned officers, for example, have the power and duty to "quell quarrels, frays, and disorders among persons subject to [the UCMJ] and to apprehend persons subject to [the UCMJ] who take part therein." Art. 7(c), UCMJ, 10 U. S. C. § 807(c). Commanding officers can impose nonjudicial disciplinary punishment for minor offenses, without the intervention of a court-martial, which includes correctional custody, forfeiture of pay, reduction in grade, extra duties, restriction to certain limits, and detention of pay. Art. 15, UCMJ, 10 U. S. C. § 815. A commissioned officer may serve as a summary court-martial or a member of a special or general court-martial. When acting as a summary court-martial or as the president of a special court-martial without a military judge, this officer conducts the proceedings and resolves all issues that would be handled by the military judge, except for challenge for cause against the president of a special court-martial without a military judge. Art. 51, UCMJ, 10 U. S. C. § 851. Convening authorities, finally, have the authority to review and modify the sentence imposed by courts-martial. Art. 60, UCMJ, 10 U. S. C. § 860. Thus, by contrast to civilian society, nonjudicial military officers play a significant part in the administration of military justice.

By the same token, the position of military judge is less distinct from other military positions than the office of full-time civilian judge is from other offices in civilian society. As the lead opinion in the Court of Military Appeals noted, military judges do not have any "inherent judicial authority separate from a court-martial to which they have been detailed. When they act, they do so as a court-martial, not as a military judge. Until detailed to a specific court-martial, they have no more authority than any other military officer of the same grade and rank." 36 M. J., at 228. Military

appellate judges similarly exercise judicial functions only when they are "assigned" to a Court of Military Review. Neither military trial nor appellate judges, moreover, have a fixed term of office. Commissioned officers are assigned or detailed to the position of military judge by a Judge Advocate General for a period of time he deems necessary or appropriate, and then they may be reassigned to perform other duties. Even while serving as military trial judges, officers may perform, with the permission of the Judge Advocate General, duties unrelated to their judicial responsibilities. Art. 26(c), UCMJ, 10 U. S. C. § 826(c). Whatever might be the case in civilian society, we think that the role of military judge is "germane" to that of military officer.

In sum, we believe that the current scheme satisfies the Appointments Clause. It is quite clear that Congress has not required a separate appointment to the position of military judge, and we believe it equally clear that the Appointments Clause by its own force does not require a second appointment before military officers may discharge the duties of such a judge.

II

Petitioners next contend that the Due Process Clause requires that military judges must have a fixed term of office. Petitioners recognize, as they must, that the Constitution does not require life tenure for Article I judges, including military judges. See *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 17 (1955). Nor does the trial by an Article I judge lacking life tenure violate an accused's due process rights. See *Palmore* v. *United States*, 411 U. S. 389, 410 (1973). Petitioners thus confine their argument to the assertion that due process requires military judges to serve for some fixed length of time—however short.

Congress, of course, is subject to the requirements of the Due Process Clause when legislating in the area of military affairs, and that Clause provides some measure of protection to defendants in military proceedings. See *Rostker* v. *Gold-*

*berg,* 453 U. S. 57, 67 (1981); *Middendorf* v. *Henry,* 425 U. S. 25, 43 (1976). But in determining what process is due, courts "must give particular deference to the determination of Congress, made under its authority to regulate the land and naval forces, U. S. Const., Art. I, § 8." *Ibid.* Petitioners urge that we apply the due process analysis established in *Mathews* v. *Eldridge,* 424 U. S. 319, 334–335 (1976). The Government contends that *Medina* v. *California,* 505 U. S. 437 (1992), supplies the appropriate analytical framework.

Neither *Mathews* nor *Medina,* however, arose in the military context, and we have recognized in past cases that "the tests and limitations [of due process] may differ because of the military context." *Rostker, supra,* at 67. The difference arises from the fact that the Constitution contemplates that Congress has "plenary control over rights, duties, and responsibilities in the framework of the Military Establishment, including regulations, procedures, and remedies related to military discipline." *Chappell* v. *Wallace,* 462 U. S. 296, 301 (1983). Judicial deference thus "is at its apogee" when reviewing congressional decisionmaking in this area. *Rostker, supra,* at 70. Our deference extends to rules relating to the rights of servicemembers: "Congress has primary responsibility for the delicate task of balancing the rights of servicemen against the needs of the military. . . . [W]e have adhered to this principle of deference in a variety of contexts where, as here, the constitutional rights of servicemen were implicated." *Solorio* v. *United States,* 483 U. S. 435, 447–448 (1987).

We therefore believe that the appropriate standard to apply in these cases is found in *Middendorf, supra,* where we also faced a due process challenge to a facet of the military justice system. In determining whether the Due Process Clause requires that servicemembers appearing before a summary court-martial be assisted by counsel, we asked "whether the factors militating in favor of counsel at summary courts-martial are so extraordinarily weighty as to

overcome the balance struck by Congress." 425 U. S., at 44. We ask the same question here with respect to fixed terms of office for military judges.

It is elementary that "a fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U. S. 133, 136 (1955). A necessary component of a fair trial is an impartial judge. See *ibid.; Tumey* v. *Ohio,* 273 U. S. 510, 532 (1927). Petitioners, however, do not allege that the judges in their cases were or appeared to be biased. Instead, they ask us to assume that a military judge who does not have a fixed term of office lacks the independence necessary to ensure impartiality. Neither history nor current practice, however, supports such an assumption.

## A

Although a fixed term of office is a traditional component of the Anglo-American civilian judicial system, it has never been a part of the military justice tradition. The early English military tribunals, which served as the model for our own military justice system, were historically convened and presided over by a military general. No tenured military judge presided. See Schlueter, The Court-Martial: An Historical Survey, 87 Mil. L. Rev. 129, 135, 136–144 (1980).

In the United States, although Congress has on numerous occasions during our history revised the procedures governing courts-martial, it has never required tenured judges to preside over courts-martial or to hear immediate appeals therefrom.[6] See W. Winthrop, Military Law and Precedents

---

[6] Congress did create a nine-member commission in 1983 to examine, *inter alia,* the possibility of providing tenure for military judges. Military Justice Act of 1983, Pub. L. 98–209, § 9(b), 97 Stat. 1393, 1404–1405 (1983). The commission published its report a year later, in which it recommended against providing a guaranteed term of office for military trial and appellate judges. See D. Schlueter, Military Criminal Justice: Practice and Procedure 33–34, and nn. 86, 87 (3d ed. 1992) (listing members of commission and describing report). Congress has taken no further action on the subject.

21–24, 953–1000 (2d ed. 1920) (describing and reprinting the Articles of War, which governed court-martial proceedings during the 17th and 18th centuries); F. Gilligan & F. Lederer, 1 Court-Martial Procedure 11–24 (1991) (describing 20th-century revisions to Articles of War, and enactment of and amendments to UCMJ). Indeed, as already mentioned, Congress did not even create the position of military judge until 1968. Courts-martial thus have been conducted in this country for over 200 years without the presence of a tenured judge, and for over 150 years without the presence of any judge at all.

### B

As the Court of Military Appeals observed in *Graf*, 35 M. J., at 462, the historical maintenance of the military justice system without tenured judges "suggests the absence of a fundamental fairness problem." Petitioners in effect urge us to disregard this history, but we are unwilling to do so. We do not mean to say that any practice in military courts which might have been accepted at some time in history automatically satisfies due process of law today. But as Congress has taken affirmative steps to make the system of military justice more like the American system of civilian justice, it has nonetheless chosen not to give tenure to military judges. The question under the Due Process Clause is whether the existence of such tenure is such an extraordinarily weighty factor as to overcome the balance struck by Congress. And the historical fact that military judges have never had tenure is a factor that must be weighed in this calculation.

A fixed term of office, as petitioners recognize, is not an end in itself. It is a means of promoting judicial independence, which in turn helps to ensure judicial impartiality. We believe the applicable provisions of the UCMJ, and corresponding regulations, by insulating military judges from the effects of command influence, sufficiently preserve judicial impartiality so as to satisfy the Due Process Clause.

Article 26 places military judges under the authority of the appropriate Judge Advocate General rather than under the authority of the convening officer. 10 U. S. C. § 826. Rather than exacerbating the alleged problems relating to judicial independence, as petitioners suggest, we believe this structure helps protect that independence. Like all military officers, Congress made military judges accountable to a superior officer for the performance of their duties. By placing judges under the control of Judge Advocates General, who have no interest in the outcome of a particular court-martial, we believe Congress has achieved an acceptable balance between independence and accountability.

Article 26 also protects against unlawful command influence by precluding a convening authority or any commanding officer from preparing or reviewing any report concerning the effectiveness, fitness, or efficiency of a military judge relating to his judicial duties. *Ibid.* Article 37 prohibits convening authorities from censuring, reprimanding, or admonishing a military judge "with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding." 10 U. S. C. § 837. Any officer who "knowingly and intentionally fails to enforce or comply" with Article 37 "shall be punished as a court-martial may direct." Art. 98, UCMJ, 10 U. S. C. § 898. The Code also provides that a military judge, either trial or appellate, must refrain from adjudicating a case in which he has previously participated, Arts. 26(c), 66(h), UCMJ, 10 U. S. C. §§ 826(c), 866(h), and the Code allows the accused to challenge both a court-martial member and a court-martial judge for cause, Art. 41, UCMJ, 10 U. S. C. § 841. The Code also allows the accused to learn the identity of the military judge before choosing whether to be tried by the judge alone, or by the judge and court-martial members. Art. 16, UCMJ, 10 U. S. C. § 816.

The entire system, finally, is overseen by the Court of Military Appeals, which is composed entirely of civilian judges who serve for fixed terms of 15 years. That court has demonstrated its vigilance in checking any attempts to exert improper influence over military judges. In *United States* v. *Mabe*, 33 M. J. 200 (1991), for example, the court considered whether the Judge Advocate General of the Navy, or his designee, could rate a military judge based on the appropriateness of the judge's sentences at courts-martial. As the court later described: "We held [in *Mabe*] that the existence of such a power in these military officers was inconsistent with Congress' establishment of the military 'judge' in Article 26 and its exercise violated Article 37 of the Code." *Graf*, 35 M. J., at 465. And in *Graf*, the court held that it would also violate Articles 26 and 37 if a Judge Advocate General decertified or transferred a military judge based on the General's opinion of the appropriateness of the judge's findings and sentences. *Ibid.*[7]

The absence of tenure as a historical matter in the system of military justice, and the number of safeguards in place to ensure impartiality, lead us to reject petitioners' due process challenge. Petitioners have fallen far short of demonstrating that the factors favoring fixed terms of office are so extraordinarily weighty as to overcome the balance achieved by Congress. See *Middendorf*, 425 U. S., at 44.

For the reasons stated, we reject the petitioners' Appointments Clause and Due Process Clause attacks on the judges who convicted them and those who heard their appeals. The judgments of the Court of Military Appeals are accordingly

*Affirmed.*

---

[7] This added limitation on the power of the Judge Advocates General to remove military judges refutes petitioners' contention that Judge Advocates General have unfettered discretion both to appoint and remove military judges.

JUSTICE SOUTER, concurring.

I join the Court's opinion on the understanding that military judges, like ordinary commissioned military officers, are "inferior officers" within the meaning of the Appointments Clause. Because these cases would raise a far more difficult constitutional question than the one the Court today decides if, as petitioners argue, military judges were "principal officers," I write separately to explain why I conclude that they are not.

I

Under the Appointments Clause, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States" (or "principal officers," as we have called them, see *Morrison* v. *Olson,* 487 U. S. 654, 670 (1988); *Buckley* v. *Valeo,* 424 U. S. 1, 132 (1976)). Art. II, § 2. "[B]ut the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Ibid.*

Military officers performing ordinary military duties are inferior officers, and none of the parties to this case contends otherwise. Though military officers are appointed in the manner of principal officers, no analysis permits the conclusion that each of the more than 240,000 active military officers (see Department of Defense, Military Manpower Statistics 18 (Mar. 31, 1993) (Table 9)) is a principal officer. See *Morrison* v. *Olson, supra,* at 670–673 (outlining criteria for determining Appointments Clause status of a federal officer). Congress has simply declined to adopt the less onerous appointment process available for inferior officers.

The Uniform Code of Military Justice authorizes the Judge Advocate General of the relevant branch of the Armed Forces to select as a military judge any commissioned military officer who meets certain qualifications going to legal knowledge and experience. See *ante,* at 168. If, as peti-

tioners argue, military judges were principal officers, this
method of choosing them from among the ranks of inferior
officers would raise two constitutional questions. As to mil-
itary officers who received their commissions before Con-
gress created the post of military judge in 1968, the question
would be whether the duties of a principal officer may be
assigned to an existing multiperson inferior office, so that
some of the office's occupants, at the choice of a lower level
Executive Branch official, will serve in new principal-officer
positions. And as to officers who received their commis-
sions after 1968 and whose appointments therefore included
the potential for service as military judge, the question
would be whether a multiperson office may be created in
which individuals will occupy, again at the choice of a lower
level Executive Branch official, either inferior-officer or
principal-officer positions.

The Appointments Clause requires each question to be an-
swered in the negative. "The Constitution, for purposes of
appointment, very clearly divides all its officers into two
classes," *United States* v. *Germaine,* 99 U. S. 508, 509 (1879),
and though Congress has broad power to create federal of-
fices and assign duties to them, see *Myers* v. *United States,*
272 U. S. 52, 128–129 (1926), it may not, even with the Presi-
dent's assent, disregard the Constitution's distinction be-
tween principal and inferior officers. It may not, in particu-
lar, dispense with the precise process of appointment
required for principal officers, whether directly or "by indi-
rection." *Springer* v. *Philippine Islands,* 277 U. S. 189, 202
(1928). Accordingly, I find it necessary to consider the sta-
tus of military judges under the Appointments Clause but,
first, to explain why the Appointments Clause's origins and
purposes support my reading of its text.

## A

In framing an Appointments Clause that would ensure "a
judicious choice" of individuals to fill the important offices

of the Union, The Federalist No. 76, p. 510 (J. Cooke ed. 1961) (A. Hamilton); the delegates to the Philadelphia Convention could draw on their experiences with two flawed methods of appointment. They were aware of the pre-revolutionary "'manipulation of official appointments'" by the Crown and its colonial governors, "one of the American revolutionary generation's greatest grievances against executive power." *Freytag* v. *Commissioner*, 501 U. S. 868, 883 (1991) (quoting G. Wood, The Creation of The American Republic 1776–1787, p. 79 (1969)). They were also aware of the postrevolutionary abuse by several state legislatures which, in reaction, had been given the sole power of appointment; by the time of the Convention the lodging of exclusive appointing authority in state legislatures "'had become the principal source of division and faction in the states.'" *Freytag, supra,* at 904, and n. 4 (SCALIA, J., concurring in part and concurring in judgment) (quoting Wood, *supra,* at 407).

With error and overcorrection behind them, the Framers came to appreciate the necessity of separating at least to some degree the power to create federal offices (a power they assumed would belong to Congress) from the power to fill them, and they came to see good reason for placing the initiative to appoint the most important federal officers in the single-person presidency, not the multimember Legislature. But the Framers also recognized that lodging the appointment power in the President alone would pose much the same risk as lodging it exclusively in Congress: the risk of "a[n] incautious or corrupt nomination." 2 M. Farrand, Records of the Federal Convention of 1787, p. 43 (rev. ed. 1937) (J. Madison) (hereinafter Farrand). Just as the Appointments Clause's grant to the President of the power to nominate principal officers would avert legislative despotism, its requirement of Senate confirmation would serve as an "excellent check" against Presidential missteps or wrongdoing.

The Federalist No. 76, *supra*, at 513.[1]  Accord, 3 J. Story, Commentaries on the Constitution of the United States 374–377 (1833) (The President will be more likely than "a large [legislative] body" to make appointments whose "qualifications are unquestioned, and unquestionable"; but because

---

[1] Hamilton's Federalist Papers writings contain the most thorough contemporary justification for the method of appointing principal officers that the Framers adopted.  See The Federalist Nos. 76 and 77, pp. 509–521.  Hamilton was clear that the President ought initially to select principal officers and that the President was therefore rightly given the sole power to nominate:

"The sole and undivided responsibility of one man will naturally beget a livelier sense of duty and a more exact regard to reputation.  He will on this account feel himself under stronger obligations, and more interested to investigate with care the qualities requisite to the stations to be filled, and to prefer with impartiality the persons who may have the fairest pretentions to them." *Id.*, No. 76, at 510–511.

Hamilton also left no doubt that the role of ultimate approval assigned to the Senate was vital:

"To what purpose then require the co-operation of the Senate?  I answer, that the necessity of their concurrence would have a powerful, though in general a silent operation.  It would be an excellent check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters from State prejudice, from family connection, from personal attachment, or from a view to popularity." *Id.*, at 513.

The same notes were struck in the Constitutional Convention, where Hamilton was actually the first to suggest that both the President and the Senate be involved in the appointments process.  See 1 Farrand 128; J. Harris, The Advice and Consent of the Senate 21 (1953).  For example, Gouvernor Morris, who was among those initially favoring vesting exclusive appointment power in the President, see 2 Farrand 82, 389, ultimately defended the assignment of shared authority for appointment on the ground that "as the President was to nominate, there would be responsibility, and as the Senate was to concur, there would be security." *Id.*, at 539.  See also 4 J. Elliot, Debates on the Federal Constitution 134 (1891) (James Iredell in North Carolina ratifying convention) ("[T]he Senate has no other influence but a restraint on improper appointments . . . . [The Appointments Clause provides] a double security").  See generally Harris, *supra*, at 17–26 (summarizing debates in the Constitutional Convention and in the ratifying conventions).

exclusive Presidential appointment power "may be abused," the Appointments Clause provides the "salutary check" of Senate confirmation, and "[t]he consciousness of this check will make the president more circumspect, and deliberate in his nominations for office").

In the Framers' thinking, the process on which they settled for selecting principal officers would ensure "judicious" appointments not only by empowering the President and the Senate to check each other, but also by allowing the public to hold the President and Senators accountable for injudicious appointments. "[T]he circumstances attending an appointment [of a principal officer], from the mode of conducting it, would naturally become matters of notoriety," Hamilton wrote; "and the public would be at no loss to determine what part had been performed by the different actors." The Federalist No. 77, at 517. As a result,

> "[t]he blame of a bad nomination would fall upon the president singly and absolutely. The censure of rejecting a good one would lie entirely at the door of the senate; aggravated by the consideration of their having counteracted the good intentions of the executive. If an ill appointment should be made the executive for nominating and the senate for approving would participate though in different degrees in the opprobrium and disgrace." *Ibid.*

The strategy by which the Framers sought to ensure judicious appointments of principal officers is, then, familiar enough: the Appointments Clause separates the Government's power but also provides for a degree of intermingling, all to ensure accountability and "preclude the exercise of arbitrary power." *Myers* v. *United States,* 272 U. S., at 293 (Brandeis, J., dissenting).

The strict requirements of nomination by the President and confirmation by the Senate were not carried over to the appointment of inferior officers. A degree of flexibility was

thought appropriate in providing for the appointment of officers who, by definition, would have only inferior governmental authority. See 2 Farrand 627. But although they allowed an alternative appointment method for inferior officers, the Framers still structured the alternative to ensure accountability and check governmental power: any decision to dispense with Presidential appointment and Senate confirmation is Congress's to make, not the President's, but Congress's authority is limited to assigning the appointing power to the highly accountable President or the heads of federal departments, or, where appropriate, to the courts of law.

## B

If the structural benefits the Appointments Clause was designed to provide are to be preserved, the Clause must be read to forbid the two ways in which the benefits can be defeated. First, no branch may aggrandize its own appointment power at the expense of another. See *Buckley* v. *Valeo*, 424 U.S., at 128–129. Congress, for example, may not unilaterally fill any federal office; and the President may neither select a principal officer without the Senate's concurrence, nor fill any office without Congress's authorization.[2]

---

[2] While it is true that "the debates of the Constitutional Convention, and the Federalist Papers, are replete with expressions of fear that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches," *Buckley* v. *Valeo*, 424 U.S. 1, 129 (1976), the Framers also expressed concern over the threat of expanding Presidential power, including specifically in the context of appointments. See, *e. g.*, 1 Farrand 101 (G. Mason); *id.*, at 103 (B. Franklin). Indeed, the Framers added language to both halves of the Appointments Clause specifically to address the concern that the President might attempt unilaterally to create and fill federal offices. See C. Warren, The Making of the Constitution 642 (1937) (discussing references in the Appointments Clause to principal offices "'established by Law,'" and to the power of appointing inferior officers which "'Congress may by law'" vest as specified). No doubt, Article I's assignment to Congress of the power to make laws makes the Legislative Branch the most likely candidate for encroaching on the power of the others. But Article II gives the President means

Second, no branch may abdicate its Appointments Clause duties. Congress, for example, may not authorize the appointment of a principal officer without Senate confirmation; nor may the President allow Congress or a lower level Executive Branch official to select a principal officer.[3]

To be sure, "power is of an encroaching nature" and more likely to be usurped than surrendered. The Federalist No. 48, at 332 (J. Madison). For this reason, our Appointments Clause cases (like our separation-of-powers cases generally) have typically addressed allegations of aggrandizement rather than abdication. See, *e. g., Buckley* v. *Valeo, supra; Springer* v. *Philippine Islands,* 277 U. S. 189 (1928); *Shoemaker* v. *United States,* 147 U. S. 282 (1893).[4] Nevertheless,

---

of his own to encroach, and indeed we have been forced to invalidate Presidential attempts to usurp legislative authority, as the *Buckley* Court recognized: "The Court has held that the President may not execute and exercise legislative authority belonging only to Congress." *Buckley, supra,* at 123 (citing *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952)).

[3] In *Freytag* v. *Commissioner,* 501 U. S. 868, 884 (1991), we observed that in the Appointments Clause the Framers limited the "diffusion" of the appointment power in order to "ensure that those who wielded it were accountable to political force and the will of the people." *Id.,* at 884. Depending on the means used to circumvent the Appointments Clause, "diffusion" can implicate either the anti-aggrandizement or the anti-abdication principle. If the full Congress creates a principal office and fills it, for example, it has adopted a more diffuse and less accountable mode of appointment than the Constitution requires; and it has violated the bar on aggrandizement. Cf. The Federalist No. 77, at 519 (explaining that the House of Representatives is too numerous a body to be involved in appointments). And if Congress, with the President's approval, authorizes a lower level Executive Branch official to appoint a principal officer, it again has adopted a more diffuse and less accountable mode of appointment than the Constitution requires; this time it has violated the bar on abdication.

[4] The theme of abdication has not been entirely absent, however. In *Morrison* v. *Olson,* 487 U. S. 654 (1988), the Court considered a challenge to a law authorizing appointment of an independent counsel by a three-judge panel and without Senate confirmation. Though the law was

"[t]he structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic," and "[n]either Congress nor the Executive can agree to waive th[e] structural protection[s]" the Clause provides. *Freytag*, 501 U. S., at 880. The Appointments Clause forbids both aggrandizement and abdication.[5]

## C

If military judges were principal officers, the method for selecting them, which is prescribed in legislation adopted by

adopted by Congress and signed by the President, the Court said that the law would nevertheless violate the Appointments Clause if the independent counsel were a principal officer. See *id.*, at 671. If the independent counsel were such an officer, the law would represent an impermissible abdication by both Congress and the President of their Appointments Clause duties.

[5] Cf. *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 406 (1928) (Taft, C. J.) ("[I]t is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power"). As Chief Justice Taft's remark suggests, the ready analogy to the Appointments Clause's anti-abdication principle is what has been called "nondelegation doctrine." The Court has unanimously invalidated legislation in which Congress delegated "to others the essential legislative functions with which it is . . . vested," *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 529 (1935); *id.*, at 553–554 (Cardozo, J., concurring), and it has read other statutes narrowly to avoid annulling them as excessive abdications of constitutional responsibility, see *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 646 (1980) (plurality opinion); *National Cable Television Assn., Inc.* v. *United States*, 415 U. S. 336, 342 (1974). See also *Industrial Union Dept., supra*, at 672–676 (REHNQUIST, J., concurring in judgment) (discussing limits on the delegation of Congress's legislative power). Nondelegation doctrine has been criticized. But see J. Ely, Democracy and Distrust 131–134 (1980) (distinguishing nondelegation doctrine from less defensible theories invoked to strike down New Deal legislation). Barring Appointments Clause abdication strikes me as plainly less problematic, however, because the text of the Constitution describes with precision the nature of the branches' appointments powers.

Congress and signed by the President, would amount to an impermissible abdication by both political branches of their Appointments Clause duties. Military officers commissioned before 1968, though they received Presidential appointment and Senate confirmation, were chosen to fill inferior offices that did not carry the possibility of service as a military judge. If military judges were principal officers, the Military Justice Act of 1968 would have authorized the creation and filling of principal offices without any Presidential nomination or Senate confirmation to that principal office, or indeed to any principal office at all. Such a process would preclude the President, the Senate, and the public from playing the parts assigned to them, parts the Framers thought essential to preventing the exercise of arbitrary power and encouraging judicious appointments of principal officers.

The office to which military officers have been appointed since enactment of the 1968 Act includes the potential for service as a military judge. But that would be a sufficient response to petitioners' Appointments Clause objection only if military judges were inferior officers. Otherwise, the method for selecting military judges even from the ranks of post-1968 commissioned officers would reflect an abdication of the political branches' Appointments Clause duties with respect to principal officers. Admittedly, the degree of abdication would not be as extreme as in the prior setting, for the President and Senate are theoretically aware that each officer nominated and confirmed may serve as a military judge. Judging by the purposes of the Appointments Clause, however, this difference is immaterial. It cannot seriously be contended that in confirming the literally tens of thousands of military officers each year the Senate would, or even could, adequately focus on the remote possibility that a small number of them would eventually serve as military

judges.[6]  And the method for appointing military judges allows the President no formal role at all in the selection of the particular individuals who will actually serve in those positions.   This process likewise deprives the public of any realistic ability to hold easily identifiable elected officials to account for bad appointments.   Thus while, as the Court explains, see *ante*, at 171–172, Congress has certainly attempted to create a single military office that includes the potential of service as a military judge, I believe the Appointments Clause forbids the creation of such a single office that combines inferior- and principal-officer roles, thereby disregarding the special treatment the Constitution requires for the appointment of principal officers.   For these reasons, if military judges were principal officers, the current scheme for appointing them would raise a serious Appointments Clause problem indeed, as the Solicitor General conceded at oral argument.   See Tr. of Oral Arg. 30–31.

## D

The argument that military judges are principal officers is far from frivolous.   It proceeds by analogizing military judges to Article III circuit and district judges, who are principal officers,[7] and to Article I Tax Court judges, who *Frey-*

---

[6] Writing in 1953, one observer pointed out that if each of the 49,956 nominations for military office sent to the Senate in 1949 "were considered for one minute . . . , it would require 832 hours to pass upon the nominations [or] an average of more than 5 hours each day that the Senate is in session."   Harris, Advice and Consent of the Senate, at 331.   This observer concluded that "Senate confirmation of military and naval officers has become for all practical purposes an empty formality."   *Ibid.*

[7] It is true that the Court has never so held and that the Constitution refers to the lower federal courts as "inferior Courts."   Art. III, § 1.   But from the early days of the Republic "[t]he practical construction has uniformly been that [judges of the inferior courts] are not . . . inferior officers," 3 J. Story, Commentaries on the Constitution 456, n. 1 (1833), and I doubt many today would disagree.   In *Freytag,* indeed, the Court as-

*tag* suggests are principal officers too (since, *Freytag* held, Tax Court judges may appoint inferior officers). In terms of the factors identified in *Morrison* v. *Olson* as significant to determining the Appointments Clause status of a federal officer, the office of military judge is not "limited in tenure," as that phrase was used in *Morrison* to describe "appoint-[ment] essentially to accomplish a single task [at the end of which] the office is terminated." 487 U. S., at 672. Nor are military judges "limited in jurisdiction," as used in *Morrison* to refer to the fact that an independent counsel may investigate and prosecute only those individuals, and for only those crimes, within the scope of the jurisdiction granted by the special three-judge appointing court. See *ibid.* Over the cases before them, military judges would seem to be no more "limited [in] duties" than lower Article III or Tax Court judges. *Id.*, at 671. And though military judges are removable, the same is true of "most (if not all) principal officers in the Executive Branch." *Id.*, at 716 (SCALIA, J., dissenting) (emphasis deleted).

The argument that military judges are principal officers, however, is not without response. Since Article I military judges are much more akin to Article I Tax Court judges than lower Article III judges, the analogy to Tax Court judges proves nothing if Tax Court judges are inferior officers, which they may be. The history that justifies declaring the judges of "inferior" Article III courts to be principal officers is not available for Tax Court judges, and though *Freytag* holds that the Tax Court is a "Cour[t] of Law" that can appoint inferior officers, it may be that the Appointments

---

sumed that lower federal judges were principal officers. See 501 U. S., at 884 (listing "ambassadors, ministers, heads of departments, and judges" as principal officers). But see Shartel, Federal Judges—Appointment, Supervision, and Removal—Some Possibilities Under the Constitution, 28 Mich. L. Rev. 485, 499–529 (1930) (arguing that lower federal judges should, and constitutionally can, be appointed by the Chief Justice).

Clause envisions appointment of some inferior officers by other inferior officers.

But even if Tax Court judges are principal officers, military trial judges compare poorly with them, because not only the legal rulings of military trial judges but also their fact-finding and sentencing are subject to *de novo* scrutiny by the Courts of Military Review. See 10 U. S. C. § 866(c). Though the powers of Court of Military Review judges are correspondingly greater, they too are distinguishable from Tax Court judges. First, Tax Court judges are removable only for cause, see 26 U. S. C. § 7443(f), while Court of Military Review judges may be freely "detail[ed]" by the relevant Judge Advocate General to nonjudicial assignments.[8] See *ante*, at 171–172. Second, Tax Court judges serve fixed 15-year terms, see 26 U. S. C. § 7443(e), while Court of Military Review judges have no fixed term of office and typically serve for far less than 15 years.[9] See Brief for Petitioners 5 (military judges "often serve terms of two, three, or four years").

"The line between 'inferior' and 'principal' officers is one that is far from clear," *Morrison*, 487 U. S., at 671, and though there is a good deal of force to the argument that military judges, at least those on the Courts of Military Review, are principal officers, it is ultimately hard to say with any certainty on which side of the line they fall. The Court

---

[8] According to the Government, "[t]he [Uniform Code of Military Justice] and the services' implementing regulations are carefully structured to ensure that military judges are independent and impartial." Brief for United States 42. This is offered to repel petitioners' due process claim, but it strengthens petitioners' Appointments Clause position. It does not strengthen it enough, however, for the fact remains that military judges are removable for a broad array of reasons.

[9] According to the Government, "military judges have the equivalent of tenure in the form of stable tours of duty." *Id.*, at 31. Again, though offered as a defense to petitioners' due process challenge, this aids petitioners' Appointments Clause argument. The fact remains, however, that the statute provides no fixed term of office for military judges.

has never decided how to resolve doubt in this area; the *Morrison* Court did not address this issue since it understood the independent counsel to be "clearly" an inferior officer. *Ibid.* Forced to decide now, I agree with the approach offered by then-Judge Ginsburg in her Court of Appeals opinion in the independent-counsel case. "Where . . . the label that better fits an officer is fairly debatable, the fully rational congressional determination surely merits . . . tolerance." *In re Sealed Case,* 838 F. 2d 476, 532 (CADC) (dissenting opinion), rev'd *sub nom. Morrison* v. *Olson,* 487 U. S. 654 (1988). Since the chosen method for selecting military judges shows that neither Congress nor the President thought military judges were principal officers, and since in the presence of doubt deference to the political branches' judgment is appropriate, I conclude that military judges are inferior officers for purposes of the Appointments Clause.

## II

Because the limits the Appointments Clause places on the creation and assignment of duties to inferior offices are respected here, for the reasons the Court and JUSTICE SCALIA give, and on the understanding that the Court addresses only the Appointments Clause's limits regarding inferior officers, I join the Court's opinion.

JUSTICE GINSBURG, concurring.

The care the Court has taken to analyze petitioners' claims demonstrates once again that men and women in the Armed Forces do not leave constitutional safeguards and judicial protection behind when they enter military service. Today's decision upholds a system of military justice notably more sensitive to due process concerns than the one prevailing through most of our country's history, when military justice was done without any requirement that legally trained officers preside or even participate as judges. Nevertheless, there has been no peremptory rejection of petitioners' pleas.

Instead, the close inspection reflected in the Court's opinion confirms:

> "[I]t is the function of the courts to make sure, in cases properly coming before them, that the men and women constituting our Armed Forces are treated as honored members of society whose rights do not turn on the charity of a military commander. . . . A member of the Armed Forces is entitled to equal justice under law not as conceived by the generosity of a commander but as written in the Constitution . . . ." *Winters* v. *United States*, 89 S. Ct. 57, 59–60, 21 L. Ed. 2d 80, 84 (1968) (Douglas, J., in chambers).

See also *Frontiero* v. *Richardson*, 411 U. S. 677 (1973); *Harmon* v. *Brucker*, 355 U. S. 579 (1958); *Crawford* v. *Cushman*, 531 F. 2d 1114 (CA2 1976).

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in part and concurring in the judgment.

I think the Appointments Clause issue requires somewhat more analysis than the Court provides, and the Due Process Clause issue somewhat less.

I

As to the former: The Court states that these cases differ from *Shoemaker* v. *United States*, 147 U. S. 282 (1893), because, after the passage of the Military Justice Act of 1968, military judges could be selected from "hundreds or perhaps thousands of qualified commissioned officers," *ante*, at 174, so that there is no concern (as there was in *Shoemaker*, where a single incumbent held the office whose duties were enlarged) that "Congress was trying to both create an office and also select a particular individual to fill the office," *ante*, at 174. That certainly distinguishes *Shoemaker*, but I do not see why it leads to the Court's conclusion that *therefore* "germaneness" analysis need not be conducted here as it was in

*Shoemaker* (though the Court proceeds to conduct it anyway, *ante,* at 174–176).

Germaneness analysis must be conducted, it seems to me, whenever that is necessary to assure that the conferring of new duties does not violate the Appointments Clause. Violation of the Appointments Clause occurs not only when (as in *Shoemaker*) Congress may be aggrandizing *itself* (by effectively appropriating the appointment power over the officer exercising the new duties), but also when Congress, *without* aggrandizing itself, effectively lodges appointment power in any person other than those whom the Constitution specifies. Thus, "germaneness" is relevant whenever Congress gives power to confer new duties to anyone other than the few potential recipients of the appointment power specified in the Appointments Clause—*i. e.,* the President, the Courts of Law, and Heads of Departments.

The Judge Advocates General are none of these. Therefore, if acting as a military judge under the Military Justice Act of 1968 is nongermane to serving as a military officer, giving Judge Advocates General the power to appoint military officers to serve as military judges would violate the Appointments Clause, even if there were "hundreds or perhaps thousands" of individuals from whom the selections could be made. For taking on the nongermane duties of military judge would amount to assuming a new "Offic[e]" within the meaning of Article II, and the appointment to that office would have to comply with the strictures of Article II. I find the Appointments Clause not to have been violated in the present case, only because I agree with the Court's dictum that the new duties are germane.*

---

*The further issues perceptively discussed in JUSTICE SOUTER's concurrence—namely, whether the Appointments Clause permits conferring principal-officer responsibilities upon an inferior officer in a manner other than that required for the appointment of a principal officer (and, if not, whether the responsibilities of a military judge are those of a principal officer)—were in my view wisely avoided by the Court, since they were

## II

With respect to the Due Process Clause challenge, I think it neither necessary nor appropriate for this Court to pronounce whether "Congress has achieved an acceptable balance between independence and accountability," *ante*, at 180. As today's opinion explains, a fixed term of office for a military judge "has never been a part of the military justice tradition," *ante*, at 178. "Courts-martial . . . have been conducted in this country for over 200 years without the presence of a tenured judge," *ante*, at 179. Thus, in the Military Justice Act of 1968 the people's elected representatives achieved a "balance between independence and accountability" which, whether or not "acceptable" to five Justices of this Court, gave members of the military at least as much procedural protection, in the respects at issue here, as they enjoyed when the Fifth Amendment was adopted and have enjoyed ever since. That is enough, and to suggest otherwise arrogates to this Court a power it does not possess.

> "[A] process of law, which is not otherwise forbidden, must be taken to be due process of law, if it can show the sanction of settled usage both in England and in this country . . . . [That which], in substance, has been immemorially the actual law of the land . . . is due process of law." *Hurtado* v. *California*, 110 U. S. 516, 528 (1884).

---

inadequately presented and not at all argued. The Petition for Certiorari said only: "There is considerable force to the argument that military appellate judges are 'superior' or 'principal' officers, in which case the President must appoint them with the advice and consent of the Senate. But in any event, . . . ." Pet. for Cert. 12. The only reference in petitioners' brief was the statement that "if military judges are principal officers, it is an even more serious transgression of the purposes of the Appointments Clause to have their original commissions substitute for an appointment to a principal office." Brief for Petitioners 15. As JUSTICE SOUTER's opinion demonstrates, the issues are complex; they should be resolved only after full briefing and argument.

As sometimes ironically happens when judges seek to deny the power of historical practice to restrain their decrees, see, *e. g., Burnham* v. *Superior Court of Cal., County of Marin,* 495 U. S. 604, 637–639 (1990) (Brennan, J., concurring in judgment), the present judgment makes no sense except as a consequence of historical practice. Today's opinion finds "an acceptable balance between independence and accountability" because the Uniform Code of Military Justice "protects against unlawful command influence by precluding a convening authority or any commanding officer from preparing or reviewing any report concerning the effectiveness, fitness, or efficiency of a military judge relating to his judicial duties"; because it "prohibits convening authorities from censuring, reprimanding, or admonishing a military judge '. . . with respect to any . . . exercise of . . . his functions in the conduct of the proceeding'"; and because a Judge Advocate General cannot decertify or transfer a military judge "based on the General's opinion of the appropriateness of the judge's findings and sentences." *Ante,* at 180, 181. But no one can suppose that similar protections against improper influence would suffice to validate a state criminal-law system in which felonies were tried by judges serving at the pleasure of the Executive. I am confident that we would not be satisfied with mere formal prohibitions in the civilian context, but would hold that due process demands the *structural* protection of tenure in office, which has been provided in England since 1700, see J. H. Baker, An Introduction to English Legal History 145–146 (2d ed. 1979), was provided in almost all the former English colonies from the time of the Revolution, see Ziskind, Judicial Tenure in the American Constitution: English and American Precedents, 1969 S. Ct. Rev. 135, 138–147, and is provided in all the States today, see National Center for State Courts, Conference of State Court Administrators, State Court Organization 1987, pp. 271–302 (1988). (It is noteworthy that one of the grievances recited against King George III in the Declaration of Independence was that "[h]e

has made Judges dependent on his Will alone, for the tenure of their offices.")

Thus, while the Court's opinion says that historical practice is merely "a factor that must be weighed in [the] calculation," *ante*, at 179, it seems to me that the Court's judgment today makes the fact of a differing military tradition utterly conclusive. That is as it should be: "[N]o procedure firmly rooted in the practices of our people can be so 'fundamentally unfair' as to deny due process of law." *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 38 (1991) (SCALIA, J., concurring).

For these reasons, I concur in Parts I and II–A and concur in the judgment.