# Nomination of Sitting Member of Congress to be Ambassador to Vietnam

The Ineligibility Clause does not bar the nomination of Representative Pete Peterson to be Ambassador to the Socialist Republic of Congress, provided that the President does not make the determination to create the office of ambassador to that government until after the expiration of the term for which Representative Peterson was elected.

July 26, 1996

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked for our opinion as to whether the Ineligibility Clause of the Constitution, U.S. Const. art. I, § 6, cl. 2, operates to bar the nomination of Representative Douglas ("Pete") Peterson to be Ambassador to the Socialist Republic of Vietnam. We conclude that, in the circumstances of this case, Representative Peterson is not ineligible, provided that the President does not make the determination to create the office of ambassador to that government until after the expiration of the term for which Representative Peterson was elected.

## I.

The Ineligibility Clause (the "Clause"), U.S. Const. art. I, § 6, cl. 2, states, in part, that

> No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased, during such time . . . .

Representative Peterson was elected on November 8, 1994, for a term that began on January 4, 1995, and that will end at noon of January 3, 1997. The President nominated him as Ambassador to the Socialist Republic of Vietnam ("Vietnam") on May 23, 1996.

If the Ineligibility Clause applies to Representative Peterson's appointment to the office of Ambassador to Vietnam, it will apply only until the end of the term for which he was elected, i.e., until January 3, 1997, but not thereafter. [1] Prior opinions of the Attorney General and of our Office have resolved that an ineligible Member of Congress cannot escape the Clause by resigning from Congress before

---

[1] See, e.g., Appointment of Senator as Federal Judge, 33 Op. Att'y Gen. 88, 89 (1922) (Senator elected for term expiring March 4, 1919, and re-elected for term beginning on same date, was eligible to be appointed as federal judge, notwithstanding fact that salaries of federal judges were increased by Act of Congress of February 25, 1919.).

accepting his or her appointment to office.[2] The opinions and practice of the executive branch have also assumed that the Clause cannot be avoided if an ineligible Member of Congress is nominated and confirmed to an office created during the term for which the Member was elected, but not *commissioned* by the President until after that term expires.[3]

Before proceeding further, we note that there is a difficult and substantial question whether the ambassadorial position for which Mr. Peterson has been nominated would be a "civil Office" covered by the Clause. The only precedent we have identified that is directly on point assumes (without discussion) that it should be considered to be such an office.[4] In accordance with that precedent, we shall assume here, without deciding, that the Ambassadorship to Vietnam would be a "civil Office" within the meaning of the Ineligibility Clause.[5]

---

[2] *See, e.g., Appointment to Civil Office*, 17 Op. Att'y Gen. 365 (1882) (prospective appointee held ineligible despite having resigned from Congress during term for which he was elected and before appointment would have been made); Memorandum for the Honorable John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Eligibility of Members of the 91st Congress to Be Appointed to the Position of Director of the Office of Management and Budget* at 4–5 (Mar. 31, 1970) (reaffirming prior view), *accord* Memorandum to the Honorable Jesse Helms, Chairman, and the Honorable Claiborne Pell, Ranking Member, from Thomas B. Griffith and Jill E. Hasday, Office of Senate Legal Counsel, *Re: The Ineligibility Clause* at 2 (July 24, 1996) ("Senate Memo").

[3] *See* Memorandum for the Attorney General from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re: Ineligibility of Sitting Congressman to Assume A Vacancy on the Supreme Court* at 3 n.2 (Aug. 24, 1987), *Federal Election Commission—Appointment of Members*, 2 Op. O.L.C. 359, 360 (1977); *Member of Congress—Appointment to Office*, 21 Op. Att'y Gen. 211, 214 (1895); *Appointment to Civil Office*, 17 Op Att'y Gen. 522, 523 (1883); *accord* Senate Memo at 2–3.

This construction of the meaning of the term "appointed" in the Ineligibility Clause originated with President George Washington, who withdrew the nomination of an ineligible former Senator to be an Associate Justice of the Supreme Court, and declared the act of nomination within that Senator's term "to have been null by the Constitution." *Nomination of George Washington* in 1, *The Documentary History of the Supreme Court of the United States, 1789–1800*, at 90 (Maeva Marcus et al. eds., 1985).

At least one later President has explicitly followed the Washington precedent. In 1973, President Richard Nixon informed the Senate that he would withhold the nomination of Senator William Saxbe to be Attorney General until after Congress had cured Senator Saxbe's ineligibility by enacting legislation that would reduce the compensation and other emoluments attached to the Office of Attorney General to those that had been in effect before Senator Saxbe began his term. President Nixon stated that "Constitutional precedents beginning with President Washington indicate that the nomination of an individual not then eligible may be improper and that any subsequent appointment based on such nomination might be null and void." Letter from the President to the Hon. Gale W. McGee, Chairman, Comm. on Post Office and Civil Service, U.S. Senate (Nov. 8, 1973), *reprinted in* S. Rep. No. 93–499, at 3 (1973); *see also To Reduce the Compensation of the Office of Attorney General: Hearing on S. 2673 Before the Senate Comm. on the Judiciary*, 93d Cong. 70 (1973) (the "Saxbe Hearing") (statement of Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel) ("In light of this constitutional practice, Senator Saxbe cannot be nominated until legislation removing his disqualification has been passed.").

[4] *See Member of Congress—Appointment to Office*, 21 Op. Att'y Gen. at 212–13 (appointment of Senator as envoy extraordinary and minister plenipotentiary to Mexico was forbidden by Clause because emoluments of that office had been increased during term for which Senator was elected); *see also* Saxbe Hearing at 50 (remarks of Professor van Alstyne) (finding that opinion to be "unquestionably sound").

[5] Accordingly, we do not rely on the view that the Office of the Senate Legal Counsel ascribes to us, that "the Clause applies only to congressionally-created offices." Senate Memo at 3.

As we have stated, the question whether the Ineligibility Clause generally applies to ambassadorships is a difficult one. It has been said that "[t]he foremost danger" that the Clause was intended to guard against "was that legislators would create offices with the expectancy of occupying them themselves." *Freytag v. Comm'r*, 501 U.S. 868, 904 (1991) (Scalia, J., concurring in judgment); *see also Atkins v. United States*, 556 F.2d 1028, 1070 (Ct. Cl. 1977) (per curiam) ("This provision was generated out of a fear that corruption would result if the legislature multiplied the number or increased the salaries of public offices for the benefit of its own members."), *cert. denied*, 434 U.S. 1009 (1978); *see generally* Saxbe Hearing at 70–71 (statement of Assistant Attorney General Dixon) (reviewing

Continued

III.

The central question, therefore, is whether the office of Ambassador to Vietnam has been "created" within the proscribed time.[6] This appears to be a case of first impression; in any event, relevant precedents are rare.[7] While federal offices are nearly always created by Acts of Congress (or else pursuant to delegations of legislative authority),[8] the executive branch has historically taken the position that the President has the inherent, constitutional power to create diplomatic offices, and Congress has generally acquiesced in that view.[9]

As long ago as 1855, Attorney General Caleb Cushing opined that the Constitution conferred on the President the power to appoint ambassadors and other diplomatic officers, subject only to the advice and consent of the Senate, in the absence

---

original materials). If the purpose of the Clause is only to prevent self-dealing *by Congress*, its prohibition would not extend to offices that were created by the *President* pursuant to his inherent, constitutional powers; and, as further discussed below, it has been the traditional position of the executive branch that diplomatic offices are created by unilateral presidential action. On this understanding of the Clause, it would not apply to the ambassadorial post for which Mr. Peterson has been nominated.

The Clause does not in terms refer, however, to civil Offices created "by Congress": it refers to "civil Offices" as such. Moreover, the Clause might well be understood to be addressed, not only to legislative self-dealing, but also to attempts by the Executive to exercise improper influence on Congress, including offers of appointments to offices that the Executive could create by virtue of its own independent powers. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 124 (1976) (per curiam) (concern of Clause was with "maintenance of the separation of powers"); Joseph Cooper & Ann Cooper, *The Legislative Veto and the Constitution*, 30 Geo. Wash. L. Rev. 467, 500 (1962) ("The framers were trying to avoid a pattern of politics in which the executive manipulated the legislature through its patronage resources or the legislature multiplied the number or increased the salaries of public officers for the benefit of its own members."). Consistent with that view, it appears that many Americans in the Founding Period were fearful of the British Crown's power to create offices, as well as to fill them. *See, e.g., The Federalist No. 69*, at 421 (A. Hamilton) (Clinton Rossiter ed. 1961) ("The king of Great Britain . . . not only appoints to all offices, but can create offices."); *Weiss v. United States*, 510 U.S. 163, 187 n.2 (1994) (Souter, J., concurring); *Freytag v. Comm'r*, 501 U.S. at 904 n.4 (Scalia, J., concurring in judgment); Gordon S. Wood, *The Creation of the American Republic 1776–1787*, at 144 (1969); Louis Fisher, *Constitutional Conflicts between Congress and the President* 23 (3d ed. 1991). So understood, the Clause would reach offices that were created by the Executive acting alone.

On yet another view of the Clause, its primary purpose was to discourage the wasteful multiplication of federal offices. In that connection, at least two delegates to the Philadelphia Convention, and one delegate to the Virginia Ratifying Convention, specifically pointed to the danger that ambassadorships might be created unnecessarily. *See Notes of Debates in the Federal Convention of 1787, Reported by James Madison* 178 (Adrienne Koch ed., 1976) (remarks of Mr. Sherman on June 23); *id.* at 452 (remarks of Mr. Gerry on August 14); *see also* 10 *The Documentary History of the Ratification of the Constitution* 1263–64 (John P. Kaminski et al. eds. 1993) (remarks of Mr. Grayson in Virginia Ratifying Convention). In light of these comments, it might again be argued that the Clause reached ambassadorial offices.

[6] We note that if the office of Ambassador to Vietnam has not been "created" during the time for which Representative Peterson was elected, the prohibition on increased "emoluments" in art. I, §6, cl. 2 would necessarily be inapplicable. The ineligibility relates to civil offices, "the Emoluments *whereof* shall have been increased" (emphasis added). If the office does not exist within the proscribed time, no emoluments have attached to it, or could have been increased.

[7] *See* John F. O'Connor, *The Emoluments Clause: An Anti-Federalist Intruder in a Federalist Constitution*, 24 Hofstra L. Rev. 89, 111 (1995) ("Not surprisingly, the question whether Congress has in fact created a new office rarely has surfaced; statutes creating new federal offices generally are clear enough to settle the matter.").

[8] *See Myers v. United States*, 272 U.S. 52, 128–29 (1926); *Weiss v. United States*, 510 U.S. at 183 (Souter, J., concurring), *Limitations on Presidential Power to Create a New Executive Branch Entity to Receive and Administer Funds Under Foreign Aid Legislation*, 9 Op. O.L.C. 76, 77–78 (1985).

[9] *See generally* Fisher, *supra* note 5, at 39–40.

of any legislation purporting to create offices for them to occupy. He stated that the Appointments Clause of the Constitution, U.S. Const. art. 2, § 2, cl. 2, [10]

> empowers the President to appoint [ambassadors] and other "public ministers," that is, any such officers as by the law of nations are recognised as "public ministers," without making the appointment of them subject, like, "other (non-enumerated) officers," to the exigency of an authorizing act of Congress. In a word, the power to appoint diplomatic agents, and to select for employment any one out of the varieties of the class, according to his judgment of the public service, is a constitutional function of the President, not derived from, nor limitable by, Congress, but requiring only the ultimate concurrence of the Senate; and so it was understood in the early practice of the Government.

*Ambassadors and other Public Ministers*, 7 Op. Att'y Gen. 186, 193 (1855). [11]

With reference to early practice, Attorney General Cushing cited the case of President George Washington's nomination of William Short to be *chargé d'affaires* in France, during the temporary leave of Ambassador Thomas Jefferson. [12] This nomination occurred very early in Washington's first term, even before the first Congress had been able to enact legislation creating the Department of Foreign Affairs (later, the State Department). [13] As Cushing pointed out, "no enactment occurs at that session, either in the act making appropriations for the service of the year, (1 Stat. at Large, p. 95), or in any other, to define the number or rank of the diplomatic agents of the United States." [14] Hence, "the designation of the officer was derived from the law of nations, and the authority to appoint from the Constitution." [15]

---

[10] The Appointments Clause states, in part, that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."

[11] For the background to Attorney General Cushing's opinion, *see* Graham H. Stuart, *American Diplomatic and Consular Practice* 6 (2d ed. 1952).

[12] *See Ambassadors and other Public Ministers*, 7 Op. Att'y Gen. at 193–94; *see also* 1 *Messages and Papers of the Presidents* 58 (James D. Richardson ed. 1896) (letter from President George Washington to the Senate, dated June 15, 1789, nominating Short).

Moreover, President Washington reported a conversation with James Madison, in which Madison concurred in the opinion, given also by John Jay and Thomas Jefferson to Washington, that the Senate had "no Constitutional right" to "interfere" with the President's decision "on the places to which it would be necessary to send persons in the Diplomatic line," or on the "grade" of such persons. *The Diary of George Washington, From 1789 to 1791* (Benson J. Lessing ed., photo. reprint 1978) (1860).

[13] *See* Act of July 27, 1789, ch. 4, 1 Stat. 28.

[14] *Ambassadors and other Public Ministers*, 7 Op. Att'y Gen. at 193.

[15] *Id.* at 194. Similarly, James Madison advised President Monroe on May 6, 1822, that it was his belief that "the practice of the Government had from the beginning been regulated by the idea that the places or offices of public ministers and consuls existed under the law and usages of nations, and were always open to receive appointments as they might be made under competent authorities." 1 *A Digest of the International Law of the United*

Continued

287

It appears that the practice of the political branches thereafter generally accorded with the Executive's conception of its constitutional power. In *Francis v. United States*, 22 Ct. Cl. 403, 405 (1887) (emphasis added), the court said:

> Most offices of the Government are established by general laws, *except in the diplomatic service*, and all salaries are fixed in like manner . . . . In the diplomatic service, Congress seems to have practically conceded, whether on constitutional grounds rightly or wrongly taken or otherwise, the duty, power, or right of the Executive to appoint diplomatic agents, of any rank or title, at any time and at any place, subject to such compensation, or none at all, as the legislative branch of the Government should in its wisdom see fit to provide . . . .

In another opinion from the same time, the court again pointed out that the Executive had consistently taken this view of its power, and that Congress had long acceded to it:

> It has been claimed by the Executive, in accordance with the opinion of Attorney General Cushing, that by the Constitution to the Executive alone is granted the power to appoint diplomatic agents of any rank or title, at any time, and at any place, and upon the exercise of this power Congress can place no extension or limitation, by undertaking either to create, abolish, or change the character, title, or rank of officers. On the other hand, to the legislative branch of the Government alone is granted the power to provide for the compensation of those, as well as of all other public officers, and this it may do in such manner as it deems best, or may withhold all compensation whenever it sees fit to do so. During the whole

---

*States* § 78 at 583 (Francis Wharton ed. 1886). (Madison therefore rejected the idea that every time an ambassador was sent to a particular country, the office of ambassador to that country was created anew. *Id.*

According to an authoritative treatise from the period of the framing of the Constitution, the law of nations taught that "each Nation possesses both the right to negotiate and have intercourse with the others, and the reciprocal obligation to lend itself to such intercourse as far as circumstances will permit it to do so." 3 Emmerich de Vattel, *The Law of Nations or The Principles of Natural Law* 362 (Charles G. Fenwick trans., 1916) (1758). Accordingly, because "Nations or sovereign States do not treat with one another directly as corporate entities; nor can their rulers or sovereigns readily meet one another personally in order to negotiate their affairs," they communicate "through the mediation of *public ministers.* This expression . . . is particularly applied to those who are appointed to fulfill [public] duties at a foreign court . . . . Every sovereign State has, therefore, the right to send and to receive public ministers. For they are the necessary agents in the negotiation of the affairs which sovereigns have with one another, and in the maintenance of the intercourse which sovereigns have a right to keep up." *Id; see also* Henry Wheaton, *Elements of International Law* § 207, at 243 (photo. reprint 1936) (1866) ("Every independent State has a right to send public ministers to, and receive ministers from, any other sovereign State with which it desires to maintain the relations of peace and amity. No State, strictly speaking, is obliged, by the positive law of nations, to send or receive public ministers, although the usage and comity of nations seem to have established a sort of reciprocal duty in this respect. It is evident, however, that this cannot be more than an imperfect obligation, and must be modified by the nature and importance of the relations to be maintained between different States by means of diplomatic intercourse.").

of the administration of President Jefferson, and part of the terms of other early Presidents, Congress annually appropriated a sum in gross "for the expenses of intercourse with foreign nations," leaving it to the Executive to fix the salaries of its several appointees.

*Byers v. United States*, 22 Ct. Cl. 59, 63–64 (1887). [16]

Accordingly, we believe that the President has the inherent, constitutional power to create diplomatic offices such as ambassadorships, without any need for statutory authorization. [17] The question then becomes that of identifying the time at which the President acts to create such offices.

Particularly instructive is a controversy over the Recess Appointments Clause, U.S. Const. art. II, § 2, cl. 3, that arose during the War of 1812, under the Presidency of James Madison. [18] The Czar of Russia had unexpectedly offered to mediate between the United States and Great Britain, who were then at war. President Madison was eager to grasp the opportunity, and in 1813 gave recess appointments to Albert Gallatin, John Quincy Adams and James A. Bayard to negotiate a peace treaty. Madison also sought the Senate's advice and consent to their appointment as Envoys Extraordinary and Ministers Plenipotentiary. The Senate confirmed Adams' and Bayard's nominations, but rejected Gallatin's. Senator Gore introduced a motion to censure Madison, on the grounds that the recess appointments had been unconstitutional. The principal argument was that because these offices had not been established by statutory law, no vacancies existed to which the President could make recess appointments. Madison's defenders in the Senate argued that the recess appointments were constitutional, maintaining that the President had the inherent power to create diplomatic offices when and as, in his judgment, international circumstances so required — and thus, if need be, during a recess

---

[16] There have, however, been instances in which Congress has apparently asserted the authority to create diplomatic offices. For example, the Act of March 2, 1909, provided that "hereafter no new ambassadorship shall be created unless the same shall be provided for by an Act of Congress." 35 Stat. 672. Notwithstanding that Act, "President Wilson appointed an ambassador to Peru in 1919 without any authorization from the Congress other than that found in the appropriation bill for the Department of State." Graham H. Stuart, *American Diplomatic and Consular Practice* at 137.

[17] The Foreign Service Act, codified in relevant part as 22 U.S.C. § 3942(a)(1), states that "[t]he President may, by and with the advice and consent of the Senate, appoint an individual . . . as an ambassador at large, as an ambassador, [or] as a minister." The relevant question here is whether the statute should be understood to be a legislative act creating the office of ambassador (and, inter alia, the office of ambassador to Vietnam). Assuming that it could be so read, Mr. Peterson would not be ineligible for the office to which he has been nominated, because that office would have been created before the beginning of the 104th Congress. (Section 3942(a) was last amended by the Foreign Relations Authorization Act, Fiscal Year 1992 and 1993, Pub. L. No. 102–138, § 141, 105 Stat. 647, 667 (1991)). In our opinion, however, the section is better understood as merely declaratory of what the constitutional procedure for appointing ambassadors is, rather than as a legislative creation of such offices. Thus, the fact that it was enacted before the current Congress would have no bearing on Mr. Peterson's eligibility. Alternatively, the section might conceivably be construed, not as itself creating ambassadorships, but as authorizing *the President* to do so. That reading would also fail to resolve the question at issue, however, because the time at which the President exercised such a *statutory* grant of authority would be identical with the time at which he exercised his *constitutional* authority to create the office of ambassador to Vietnam.

[18] The Recess Appointments Clause states that the President "shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session."

of the Senate. [19] Senator Bibb, an ally of Madison's, reasoned that it was essential to recognize

> two descriptions of offices altogether different in their nature, authorized by the Constitution — one to be created by law, and the other depending for their existence and continuance upon contingencies. Of the first kind, are judicial, revenue, and similar offices. Of the second, are Ambassadors, other Public Ministers and Consuls. The first description organize the Government and give it efficacy. They form the internal system, and are susceptible of precise enumeration. When and how they are created, and when and how they become vacant, may always be ascertained with perfect precision. Not so with the second description. They depend for their original existence upon no law, *but are the offspring of the state of our relations with foreign nations*, and must necessarily be governed by distinct rules. As an independent Power, the United States have relations with all other independent Powers; and the management of those relations is vested in the Executive.

22 Annals of Cong. 699 (1814) (emphasis added).

With respect to the disputed recess appointments, Bibb argued

> that the office could not exist until the Russian mediation was proposed, and that it was proposed during the recess of the Senate. Until, therefore, the office was created, it could not be said to have been either full or vacant; but the moment it commenced its existence, it was necessarily full or vacant. It was vacant until filled by the President. *The office itself, like that of all foreign missions, was the offspring of circumstances, and the happening of the vacancy was contemporaneous with the commencement of the office. They were both created by the occasion; the occasion occurred; the office began its existence*; the vacancy happened during the recess of the Senate; and as the Executive is authorized "to fill up all vacancies which may happen during the recess," it was his Constitutional right to fill this.

26 Annals of Cong. 702–03 (1812) (emphasis added). [20]

---

[19] For the circumstances of Madison's recess appointments and the ensuing controversy, see 6 Irving Brant, *James Madison* 155–57, 242–43 (1961).

[20] Senator Bibb also articulated a distinct defense of President Madison's action. According to this alternative theory, "the office commenced with every independent Power from the moment the United States became independent, and authorized the appointment of foreign Ministers, and it will continue to exist so long as we and they

Senator Horsey (a Federalist, and so not of Madison's party), also defended the President's recess appointments, arguing that

> [t]he office then of a public Minister is the medium through which the Executive is enabled to manage our foreign relations, and particularly to conduct negotiations. It is an office wholly different from the ordinary offices created by the Constitution or by law. . . . [I]t is an office not created by the Constitution, nor by any municipal law, but emanates from the laws of nations and is common to all civilized Governments. . . . It is an office, if it may be so called, *sui generis*. The number may be multiplied to any extent, or diminished. *It is brought forth with the occasion, and disappears when the occasion ceases. When not filled, if it exists at all, it is only in contemplation.* . . . The office of a public Minister, therefore, depends upon events, upon the state of foreign affairs, and is authorized by the laws of nations. . . . *The office in truth attaches whenever the occasion arises to use it, and the act of appointment is the consummation of the law.*

*Id.* at 711–12 (emphasis added). [21]

Review of this controversy suggests that, at the very least, diplomatic offices may be created by the President at whatever time, in his judgment, the interests of the United States in its dealings with foreign nations require them to be made. [22]

---

continue independent, unless destroyed by the termination of the relations which created it. The period at which it should be filled is left by the Constitution to the discretion of the President." *Id.* at 699. On this account, it appears that the office of ambassador exists as a necessary incident to sovereignty, and thus has existed since the United States became independent in 1776. *Cf. United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 316–18 (1936) (power to maintain diplomatic relations was vested in United States as an incident of external sovereignty upon separation from Great Britain). Were that theory correct, it would appear to follow that the office for which Representative Peterson was nominated — the Ambassadorship to Vietnam — existed since (at least) the time that diplomatic relations between the United States and Vietnam became possible, and thus that the office had not been "created" during the term for which he was elected.

[21] As Senator Horsey explained his view, the "Occasion" for instituting the mission to Russia was the Russian Government's offer of March 8, 1813, to mediate between the United States and Great Britain, and the acceptance of that offer by the Secretary of State on March 11, 1813. This occasion "happened in the recess of the Senate. The office then attached, and with it the vacancy, which was filled and the office perfected by issuing the commissions . . . ." *Id.* at 713.

[22] *See* Memorandum of Law, *Re: Appointment of Deputy Special Representative for Trade Negotiations* at 5, accompanying Letter for Arthur B. Focke, General Counsel, Bureau of the Budget, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel (Dec. 19, 1962) ("[T]he office is created whenever the President determines that the interests of the United States require diplomatic representation or negotiation."). Madison himself may subsequently have taken a different view of the matter from that of his defenders in the Senate. In a memorandum of 1834 — twenty years after the controversy over the recess appointments — he expressed the opinion that the "place of a foreign minister or consul is not an office in the constitutional sense of the term," basing that conclusion in part on the premise that "[i]t cannot, as an office, be created by the mere appointment for it, made by the President and Senate, who are to fill, not create offices." *Power of the President to appoint Public Ministers and Consuls in the recess of the Senate, in* 4 *Letters and Other Writings of James Madison* 350 (1865). On this theory, "[t]he place of a foreign minister or consul is to be viewed as created by the law of nations." *Id.* Were Madison correct in denying that an ambassadorship is an "office" in the constitutional sense, no Ineligibility Clause issue would arise.

To be sure, the President's decisionmaking may unfold over a period of time, and he will ordinarily take various preparatory steps relating to the creation of a diplomatic office before he unequivocally determines to do so. The remarks of Madison's defenders in the Senate debate suggest that, if it becomes necessary to pinpoint the precise time at which the President creates such an office (as, for instance, in determining the validity of a recess appointment), then that time should be identified as the moment at which he *fills* the office. While the 1814 debate was directed to the interpretation of the Recess Appointments Clause, we believe that it also illuminates the meaning of the Ineligibility Clause.

## III.

We think it fair to say that the patterns of constitutional practice that we have described do not conclusively answer the question *when* the office of an ambassadorship is created. Nonetheless, we think that the legal and historical materials strongly point toward a particular answer, and we find that answer to be considerably more persuasive than any of the alternatives. Based on our survey of the materials, including the 1814 debate, we believe that the following tests are appropriate in determining when, for purposes of the Ineligibility Clause, the President has created the office of ambassador to a particular foreign State, in cases where such an ambassadorship has not existed before or (as in the case of Vietnam) has lapsed or been terminated:

1. In the usual course, the office is created at the time of appointment of the first ambassador to a foreign State once the President establishes diplomatic relations with that State. All that precedes the appointment — offering to establish normal diplomatic relations, receiving the foreign State's agreement to receive a particular person as the United States' ambassador, nominating and confirming that individual as ambassador — are all steps preparatory to the creation of the office. [23] If the President ultimately declines to appoint an ambassador, the "office" is never created.

2. The President, nonetheless, retains the power to alter the ordinary course of events, and to create the office at some other time — or not at all. The act of creating the office must be distinguished from the preparatory steps leading to its creation. The preparatory acts indicate that the President *intends* to create the office; they do not in themselves constitute its creation. Indeed, in the ordinary course, the President should be understood to *intend* to create the office of ambas-

---

[23] The preparations leading up to the creation of the office can be analogized to the legislative process. Congress holds hearings on legislative proposals, conducts debates on them, considers amendments, casts votes on a final bill and presents that bill to the President. All of these activities are designed to culminate in the enactment of a bill into law. Nonetheless, exceptional cases aside, a bill does not actually become law until the moment that the President *signs* it. *See INS v. Chadha,* 462 U.S. 919 (1983).

sador upon the *appointment* of the individual as the first ambassador to the receiving State. [24]

We turn now to the application of these tests to the ambassadorship to Vietnam.

## IV.

The process by which the United States has been normalizing its relations with Vietnam has been underway for several years. [25] The Republic of Vietnam ("RVN") was constituted as an independent State within the French Union in 1950, and the United States sent a Minister to that State. The United States did not recognize the Democratic Republic of Vietnam ("DRVN"), which had earlier declared itself to be an independent State. Thereafter, on June, 25, 1952, the United States appointed an Ambassador to the RVN, and upgraded the United States Legation in Saigon to Embassy status. In 1954, Vietnam was partitioned into what came commonly to be called "North" and "South" Vietnam. Despite an international agreement calling for the reunification of Vietnam, that did not occur; instead, the RVN, functionally, became South Vietnam, and the DRVN, functionally, North Vietnam. The United States maintained an ambassadorial post in the RVN from 1952 onwards. The last United States Ambassador left his post in Saigon on April 29, 1975. [26]

After the Communist victory over South Vietnam in April, 1975, it became the position of the United States that " '[t]he Government of South Vietnam has ceased to exist and therefore the United States no longer recognizes it as the sovereign authority in the territory of South Vietnam. The United States has not recognized any other government as constituting such authority.' " *Republic of Vietnam v. Pfizer, Inc.*, 556 F.2d 892, 895 n.4 (8th Cir. 1977) (quoting Letter for the Department of Justice from the Department of State (June 9, 1975)).

During the present administration, several successive and carefully measured steps were taken with a view to improving, and perhaps normalizing, relations between the United States and Vietnam. On July 2, 1993, President Clinton announced that the United States would no longer oppose the resumption of aid to Vietnam by international financial institutions. On February 3, 1994, the President announced the lifting of the United States' embargo against Vietnam. He also announced an intent to open a liaison office in Hanoi in order to promote further progress on issues of concern to both countries, including the status of American prisoners of war and Americans missing in action. His statement emphasized, however, that "[t]hese actions do not constitute a normalization of our rela-

---

[24] In unusual circumstances, the President might depart from this procedure. For example, following the establishment of diplomatic relations, he might *by proclamation* declare the office of ambassadorship to a particular country to be created, even if he had not appointed a particular person to fill that office.

[25] *See generally* Congressional Research Service, Report for Congress, *Vietnam: Procedural and Jurisdictional Questions Regarding Possible Normalization of U.S. Diplomatic and Economic Relations* (Aug. 4, 1994).

[26] *See generally* Office of the Historian, *Principal Officers of the Department of State and United States Chiefs of Mission: 1778–1990*, Dep't of State Publication 9825, at 163 (Jan. 1991).

tionships. Before that happens, we must have more progress, more cooperation and more answers." [27] On May, 26, 1994, the United States and Vietnam formally entered into consular relations within the framework of the Vienna Convention on Consular Relations, *done* Apr. 18, 1961, 21 U.S.T. 77, 596 U.N.T.S. 261, to which both States were party. The United States, however, continued to condition diplomatic relations on progress in areas of concern to it. On January 28, 1995, the United States and Vietnam signed an agreement relating to the restoration of diplomatic properties and another agreement relating to the settlement of private claims. On July 11, 1995, the President announced an offer to establish diplomatic relations with Vietnam under the Vienna Convention on Diplomatic Relations, *done* Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 — an offer that Vietnam accepted on the following day. In announcing that offer, the President stated that from the beginning of his Administration, "any improvement in relationships between America and Vietnam has depended upon making progress on the issue of Americans who were missing in action or held as prisoners of war." [28] Soon thereafter, the United States Liaison Office in Hanoi was upgraded to a Diplomatic Post.

On May 8, 1996, the Government of Vietnam gave its agreement (*"agrément"*) to the United States' proposal that Representative Peterson be Ambassador Extraordinary and Plenipotentiary of the United States to Vietnam. [29] On May 23, 1996, the President submitted Mr. Peterson's name to the United States Senate for its advice and consent to that appointment.

In our judgment, while this pattern of activity demonstrates that the President fully intends and expects to create the office of ambassador to Vietnam, it does not establish that he has, in fact, yet done so. The establishment of diplomatic relations does not entail the establishment of a diplomatic mission or the creation of the office of an ambassador. *See* Vienna Convention on Diplomatic Relations, art. 2, 23 U.S.T. at 3231, 500 U.N.T.S. at 98. Moreover, the existence of diplomatic relations with Vietnam does not require (although it may normally assume) an exchange of ambassadors, since relations may be conducted at a lower diplomatic level. Further, we do not think that Vietnam's *agrément* to receive Mr. Peterson as ambassador establishes that that office exists for constitutional purposes. [30] Nor (although the question is closer) does the President's decision to submit Mr. Peterson's name to the Senate for confirmation. Even if Mr. Peterson

---

[27] *Remarks on Lifting the Trade Embargo on Vietnam and an Exchange With Reporters*, Pub. Papers of William J. Clinton 178, 179 (Feb. 3, 1994).

[28] *Remarks Announcing the Normalization of Diplomatic Relations with Vietnam*, 2 Pub. Papers of William J. Clinton 1073, 1073 (July 11, 1995).

[29] "In order to avoid the unfriendly feeling which might arise through the refusal of a state to receive a foreign representative it is customary for the sending state to submit in advance the name of its envoy to the government of the state to whom he is to be accredited. The procedure of determining in advance as to whether the envoy will be *persona grata* is called *agréation* and the approval *agrément*." Stuart, *supra* note 16, at 139–40.

[30] Indeed, as a matter of *international* law, it may be that the office of ambassador to Vietnam will not begin to exist until our representative is "duly accredited and received" as ambassador by the Government of Vietnam. *Hollander v. Baiz*, 41 F. 732, 735 (S.D.N.Y.), *prohibition denied by* 135 U.S. 403 (1890).

is confirmed, the President would retain the discretion not to send an ambassador to Vietnam, or otherwise not to create that office. In view of the facts that the United States has not had an ambassador to Vietnam since 1975 (and has never had an ambassador to the present government), that the process of normalizing relations between the United States and Vietnam has been a complex and protracted one, and that contingencies, however unlikely, may yet arise that would lead the President to conclude that it was not in the United States' best interests to appoint and send an ambassador, we do not think that the office of ambassador to Vietnam can be said to *exist* unless and until the President actually completes the process by appointing an officer to that position. Accordingly, if the President decides not to appoint Mr. Peterson to that office until after the expiration of the present term of Congress on January 3, 1997, we do not think that Mr. Peterson is constitutionally ineligible for that appointment.

In the interests of clarity, we repeat that we are *not* maintaining that an "appointment" within the meaning of the Ineligibility Clause does not occur until the appointee is actually *commissioned* by the President. Whatever the merits of that view as an original proposition (and they are substantial), [31] we are not writing on a clean slate. Accordingly, we follow the centuries-old teaching and practice of the executive branch in assuming that the nomination of an ineligible individual is itself a constitutional nullity, even if the commissioning of that individual were to occur after the term of his or her ineligibility. Our position is that, in the singular circumstances of this case, the relevant *office* — the Ambassadorship to Vietnam — has not yet been "created," so that no ineligibility exists. Thus, both the President's act of nominating Mr. Peterson, and the Senate's act of confirming him (if it does), are constitutionally valid.

## V.

It could be argued that our analysis gives insufficient weight to the policy of the Ineligibility Clause, inasmuch as it makes it possible, by the President's decision to withhold creating a diplomatic post until after the expiration of a congressional term, to appoint an otherwise ineligible Member of Congress to that position. We would disagree. The tradition of interpreting the Clause has been "formalistic" rather than "functional," and our analysis comports fully with the literal meaning of the text. Furthermore, it is important to bear in mind that the Clause was a compromise that reflected policy disagreements at the Philadelphia Convention: to some extent, at least, the Clause was designed to *permit* Members of Congress, in appropriate circumstances, to hold office in the executive branch. [32]

---

[31] *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 155 (1803) (appointment not effective until commissioning by President); *Appointments to Office—Case of Lieutenant Coxe,* 4 Op. Att'y Gen. 217, 219 (1843).

[32] *See* Saxbe Hearing at 67 (emphasis added) (testimony of Assistant Attorney General Dixon) ("There was a disagreement in the convention concerning this issue and that was because there was a competition in values. The

Continued

Moreover, even at the time of the Framing, it was understood that the Clause was a highly imperfect safeguard against the danger that the prospect of appointment to office would improperly influence Members of Congress. Luther Martin, a delegate from Maryland to the Philadelphia Convention, provided his State legislature with a critical report on the Convention's work. As to the Ineligibility Clause, he wrote:

> As to the exception that [Members of Congress] cannot be appointed to offices created by themselves, or the emoluments of which are by themselves increased, it is certainly of little consequence, since they may easily evade it by creating new offices, to which may be appointed the persons who fill the offices before created, and thereby vacancies will be made, which may be filled by the members who for that purpose have created the new offices. [33]

More recent commentators have also pointed out the inadequacy of the Clause as a device for controlling the abuses at which it is apparently aimed. Thus, former Assistant Attorney General Antonin Scalia rejected a policy-based interpretation of the Clause, writing:

> the constitutional provision does not avoid some degree of absurdity in any event, no matter what imaginatively constructed extensions are devised; and . . . therefore it is best to restrict the provision to its clear, literal meaning . . . . As for a means of easy evasion, nothing could be easier than having the Congress create a new post, to be filled by an existing appointee, and then appointing the favored Member to the vacated office. In light of the essential incohesiveness of the constitutional provision, I do not regard the policy argument . . . as persuasive.

Memorandum for Hugh M. Durham, Chief, Legislative & Legal Section, Office of Legislative Affairs, from Antonin Scalia, Assistant Attorney General, Office

---

matter was not viewed as being simple or mechanistic. As Madison said at one point: 'Some gentlemen give too much weight and others too little to this subject.' There was a fear that unless the Constitution did include an ineligibility clause of this sort, that there would be undue inroads on the independence of the legislature by the Executive in enticements and appointments to the executive branch and that also there might be self-interest in the members' approach toward salary increases or toward creation of new offices. *At the same time there was also a recurrent concern shared by Madison who was a primary mover of the clause and also Pinkney, that a total bar would be a disservice to the public and indeed to the executive branch and judicial branch.'*).

[33] *The Genuine Information Delivered to the Legislature of the State of Maryland Relative to the Proceedings of the General Convention Lately Held at Philadelphia, By Luther Martin, Esquire* (1788), *reprinted in* 2 Herbert J. Storing, The Complete Anti-Federalist 19, 52 (1981).

of Legal Counsel, *Re: Proposed bill to increase the salary of the Attorney General* at 6 (Nov. 22, 1974). [34]

## VI.

Finally, there remains the question whether the President may nominate, and the Senate confirm, an individual for an office that does not exist at the time of the nomination and confirmation, but is expected to come into existence later. The Office of the Senate Legal Counsel raises this objection, stating that "we are aware of no prior instance in which the President appointed someone to an office that did not yet exist." [35] There are, however, several such precedents.

The practice of the political branches establishes that the President may make a nomination, and the Senate give its advice and consent, for an office not yet in being. For example, the statute creating the Occupational Safety and Health Review Commission became effective on April 28, 1971. *See* Occupational Safety and Health Act of 1970, Pub. L. No. 91–596, § 34, 84 Stat. 1590, 1620. President Nixon nominated the first members of the Commission on March 19, 1971, *see* 117 Cong. Rec. 7270 (1971), and the Senate confirmed the nominees on April 14, 1971, "effective in accordance with the provisions of law," *id.* at 10,458. Similarly, Reorganization Plan No. 1 of 1953, 3 C.F.R. 1022 (1949–1953), *reprinted in* 5 U.S.C. app. at 1488 (1994), *and in* 67 Stat. 631 (1953), created the office of Secretary of Health, Education, and Welfare, as of April 11, 1953. On April 2, 1953, President Eisenhower nominated Oveta Culp Hobby to be the first Secretary, effective April 11, *see* 99 Cong. Rec. 2716 (1953), and the Senate confirmed her on April 10, *id.* at 2958. [36]

---

[34] Similarly, Professor van Alstyne, testifying in a Senate hearing regarding the possibility of curative legislation to remove Senator Saxbe's ineligibility to be appointed Attorney General, noted that

the mechanicalism of article I, section 6, clause 2, has the same virtues and the same vices as similar provisions elsewhere in the document. For along with the virtue of clear and impersonal operation, there is, of course, the shortcoming that legislative technique — that a line drawn in a manner giving conclusive effect to but one or two circumstances may often fail to reach a variety of possible corrupt practices that a more general standard would tend to reach. It is clear, for instance, . . . that a Senator or Representative nearing the end of his term might be induced to vote to create a new office or to raise the emoluments in an existing one, expecting in return for his vote at once to be appointed to that office the instant his term expires. Yet, the clause does not reach that point.

Saxbe Hearing at 51.

[35] Senate Memo at 4.

[36] Other instances in which Presidents have made nominations for offices not yet in being include: (1) the nomination on January 20, 1989, of Edward Derwinski to be the first Secretary of Veterans Affairs, 135 Cong. Rec. 321 (1989), under a statute that precluded appointment until after January 21, 1989, *see* Department of Veterans Affairs Act, Pub. L. No. 100–527, § 18(b), 102 Stat. 2635, 2648 (1988) (codified as amended at 38 U.S.C. § 301 note); (2) the nomination on June 8, 1979, of the first Federal Inspector for the Alaska Natural Gas Transportation System, 125 Cong. Rec. 14,209 (1979), under Reorganization Plan No. 1 of 1979, 3 C.F.R. 505 (1980), *reprinted in* 5 U.S.C. app. at 1584 (1994), *and in* 93 Stat. 1373 (1979), which became effective on July 1, 1979; and (3) the nomination on November 16, 1970, of William D. Ruckelshaus to be the first Administrator of the Environmental Protection Agency, 116 Cong. Rec. 37,347 (1970), under a Reorganization Plan creating the office as of December 2, 1970, Reorganization Plan No. 3 of 1970, 3 C.F.R. 199 (1971), *reprinted in* 5 U.S.C. app. at 1551 (1994), *and in* 84 Stat. 2086 (1970).

The reasoning that supports this procedure is similar to that underlying nominations and confirmations for prospective vacancies in existing offices:

> [A]s a constitutional matter, nothing precludes the nomination and confirmation of a successor while the incumbent still holds office. Confirmation does not confer any rights on the nominee; the President remains free to decide that he does not want to make the appointment, which is not legally completed until the execution of the commission.

*Nominations for Prospective Vacancies on the Supreme Court*, 10 Op. O.L.C. 108, 109 (1986). The President and Senate have repeatedly used this procedure for prospective vacancies. *See id.* at 110–11. Just as in the case of prospective vacancies, nomination and confirmation for a prospective office can confer no rights on the nominee, who must await further decisions and the President's appointment.

The Office of the Senate Legal Counsel also objects that the nomination and confirmation of an individual to a position that is to be created later "raises serious separation of powers concerns because it might fundamentally reshape and limit the Senate's constitutionally-based confirmation power. The Senate's advice and consent function requires a review not simply of the nominee, but of his fitness to fulfill a particular office." [37] We do not find that objection forceful in the circumstances present here. First, the Senate's constitutional power to reject a nominee for any reason, or for none, is completely unimpaired. Second, in the actual circumstances of this nomination, the Senate possesses all the facts that are needed to make an informed judgment of the nominee's fitness to serve as Ambassador to Vietnam. Even if that particular ambassadorship has yet to be created, the duties and responsibilities of an ambassador are of course perfectly familiar to the Senate.

## Conclusion

Accordingly, we conclude that Representative Peterson is not constitutionally ineligible for appointment as Ambassador to Vietnam, provided that the President finally creates that office after Representative Peterson's term of office as a Member of Congress has expired on January 3, 1997.

CHRISTOPHER SCHROEDER
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[37] Senate Memo at 4.