PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Petitioner-Appellant,*

v.

No. 10-6281

BENJAMIN BARNARD JOSHUA,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(5:09-hc-02035-BR)

Argued: May 10, 2010

Decided: June 14, 2010

Before GREGORY, DUNCAN, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Gregory and Judge Agee concurred.

## COUNSEL

**ARGUED**: Anisha S. Dasgupta, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Lisa Hertzer Schertler, SCHERTLER & ONORATO, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Tony West, Assistant Attorney General, Beth S. Brinkmann, Dep-

uty Assistant Attorney General, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; George E. B. Holding, United States Attorney, R. A. Renfer, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellant.

---

**OPINION**

DUNCAN, Circuit Judge:

Section 4248 of Title 18, enacted in the Adam Walsh Child Protection and Safety Act of 2006, authorizes the civil commitment of "sexually dangerous" persons "in the custody of the Bureau of Prisons." 18 U.S.C. § 4248(a). The district court dismissed the government's petition for civil commitment under § 4248 upon finding that an individual convicted and sentenced by United States Army court-martial but housed within a facility operated by the United States Bureau of Prisons ("BOP")—what the BOP calls a "contractual boarder"—was not "in the custody of the Bureau of Prisons" under the statute. For the reasons that follow, we affirm.[1]

I.

Appellee Benjamin Barnard Joshua was an Army officer stationed in Germany. He was prosecuted by military court-martial in 1995 for sexually molesting children in violation of the Uniform Code of Military Justice (the "UCMJ"), 10 U.S.C. §§ 801-946. After Joshua pleaded guilty, the court-martial sentenced him to 25 years imprisonment. The court-

---

[1]One week after we heard oral argument, the Supreme Court held in *United States v. Comstock*, No. 08-1224, 2010 WL 1946729 (May 17, 2010), that the Necessary and Proper Clause authorized Congress to enact § 4248. Because the Court did not directly consider the separate issue that we address today, *Comstock* does not control our analysis.

martial also ordered loss of pay and dishonorable discharge. Joshua began serving his prison sentence with an Army garrison in Germany. He was later transferred to the United States Disciplinary Barracks in Leavenworth, Kansas ("USDB Leavenworth"), operated by the military.

In June 2001, when USDB Leavenworth was being downsized, the Army transferred Joshua to the BOP. He was initially housed at the Federal Correctional Institute in Sandstone, Minnesota, and later transferred to the Federal Correctional Institute in Butner, North Carolina. Because of his military prisoner status, the BOP housed Joshua under a May 1994 "Memorandum of Agreement" between the Army and BOP (the "Memorandum") regarding "Transfer of Military Prisoners to the Federal Bureau of Prisons." J.A. 67. Under this agreement, the BOP promised to house up to 500 military prisoners for the Army's convenience. The BOP has called such prisoners "[c]ontractual boarders." 28 C.F.R. § 550(b)(3). Although they become "subject to all [ ]BOP administrative and institutional policies and procedures," the Memorandum states that military prisoners within BOP facilities remain "in permanent custody of the U.S. Army," which "retain[s] clemency authority." J.A. 68-69.

On March 9, 2009, eight days before Joshua's scheduled release, the Attorney General certified him as "sexually dangerous" and the government filed a petition for civil commitment under § 4248.[2] Joshua moved to dismiss the petition, claiming that he was not "in the custody of the Bureau of Prisons." 18 U.S.C. § 4248(a). Reasoning that "custody" in this context referred to legal authority over Joshua's sentence ("legal custody") rather than to immediate physical confine-

---

[2]The Attorney General's certification stayed Joshua's release from sentenced incarceration pending proceedings under the statute. *See* 18 U.S.C. § 4248(a) ("A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section.").

ment by the BOP ("physical custody"), the district court granted the motion to dismiss. This appeal followed.

On February 2, 2010, the government filed a motion in the district court to stay Joshua's release pending appeal. The district court denied that motion on March 10, 2010, and the government sought similar relief in this court. Recognizing the potential for our decision on the motion to moot the underlying appeal—for Joshua would likely be outside the BOP's control once released—we granted temporary relief and expedited briefing and oral argument.

## II.

This appeal "raises a question of statutory interpretation, a quintessential question of law, which we review de novo." *Stephens ex rel. R.E. v. Astrue*, 565 F.3d 131, 137 (4th Cir. 2009). Section 4248 lists three categories of people whom the Attorney General may commit for sexual dangerousness:

> In relation to a person [1] who is *in the custody of the Bureau of Prisons*, or [2] who has been committed to the custody of the Attorney General pursuant to section 4241(d), or [3] against whom all criminal charges have been dismissed solely for reasons relating to the mental condition of the person, the Attorney General . . . may certify that the person is a sexually dangerous person . . . .

18 U.S.C. § 4248(a) (emphasis added). Because the government contends that Joshua falls within the first category,[3] we must interpret the statutory language "in the custody of the Bureau of Prisons." *Id.* Reasoning that "custody" in this context refers to legal rather than physical custody, Joshua asserts

---

[3]The government does not argue Joshua falls within the second or third categories, which apply to defendants found not guilty by reason of insanity or adjudged incompetent to stand trial.

that this statutory language does not cover military prisoners convicted and sentenced by court-martial but then housed within a BOP facility for the Army's convenience. Although declining to define "custody," the government argues that Congress intended the language to cover people serving a military prison sentence within a BOP facility.

A.

Because the legal issue presented concerns Joshua's confinement by civilian authorities after being convicted and sentenced by military court-martial, we preface our analysis by clarifying the difference between the military and civilian criminal justice and penal systems. Having markedly different substantive laws and separate adjudicative proceedings, "the[se] systems are separate as a matter of law." *United States v. Dowty*, 48 M.J. 102, 106 (C.A.A.F. 1998); *see also Schlesinger v. Councilman*, 420 U.S. 738, 746 (1975) ("[O]f necessity, military law . . . is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment.").

Congress has enacted numerous federal criminal statutes, codified mostly in Title 18, that are applicable to civilians and military personnel alike. Unlike states' criminal laws arising from a plenary power to legislate for the general welfare, federal criminal statutes are somewhat limited because they must derive from Congress's powers specifically enumerated by Article I, Section 8. By contrast, the UCMJ contains broader criminal prohibitions applicable to military personnel, codified in Title 10, that derive from Congress's constitutional authority "to make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art I, § 8, cl. 14; *see Weiss v. United States*, 510 U.S. 163, 177 (1994) ("[T]he Constitution contemplates that Congress has plenary control over rights, duties, and responsibilities in the framework of the Military Establishment, including regulations, procedures, and remedies related to military discipline." (internal quota-

tions omitted)). Accordingly, "[w]hile a civilian criminal code carves out a relatively small segment of potential conduct and declares it criminal, the Uniform Code of Military Justice essays more varied regulation of a much larger segment of the activities of the more tightly knit military community." *Parker v. Levy*, 417 U.S. 733, 749 (1974). For example, the UCMJ contains criminal prohibitions against insubordination, 10 U.S.C. § 889, maltreatment of subordinates, 10 U.S.C. § 893, and malingering, 10 U.S.C. § 915.

These distinct bodies of criminal law are enforced by different prosecutorial and court systems. Whereas the Attorney General has responsibility for prosecuting federal crimes, Congress granted him no authority to enforce the UCMJ against military personnel. *See* 10 U.S.C. §§ 822-24 (reserving such authority to the President, the Secretary of Defense, the Secretary for each military branch, and various commanding military officers). Furthermore, whereas "civilian courts are the normal repositories of power to try persons charged with crimes against the United States," *Reid v. Covert*, 354 U.S. 1, 21 (1957), Congress created a separate court system for the military under Article I, *see Chappell v. Wallace*, 462 U.S. 296, 302 (1983) ("Congress has . . . established a comprehensive internal system of justice to regulate military life, taking into account the special patterns that define the military structure."). This system consists of military trial courts called "courts-martial," Courts of Criminal Appeals, and the United States Court of Appeals for the Armed Forces.

The civilian and military court systems have markedly different safeguards and procedures. *See O'Callahan v. Parker*, 395 U.S. 258, 261-62 (1969) (recognizing "the establishment and development of a system of military justice with fundamental differences from the practices in the civilian courts"), *overruled on other grounds*, *Solorio v. United States*, 483 U.S. 435 (1987); *United States v. Mariea*, 795 F.2d 1094, 1101 (1st Cir. 1986) ("[M]ilitary courts-martial and the civilian court system constitute totally separate systems of justice,

with different procedures, protections and personnel."). For example, whereas federal district judges have life tenure and authority to hear any matter properly presented, military trial judges not only lack life tenure but also "do not serve for fixed terms and may perform judicial duties only when assigned to do so." *Weiss*, 510 U.S. at 168; *see Palmore v. United States*, 411 U.S. 389, 404 (1973) ("The 'exigencies of military discipline require the existence of a special system of military courts in which not all of the specific procedural protections deemed essential in Art. III trials need apply.'" (quoting *O'Callahan*, 395 U.S. at 261)). Furthermore, various procedural protections available in federal district courts are absent from military courts-martial. Most notably, courts-martial lack the constitutional guarantees of indictment by grand jury and trial by jury. *See O'Callahan*, 395 U.S. at 273; *see also Reid*, 354 U.S. at 22 ("[T]he Fifth and Sixth Amendments require that certain express safeguards, which were designed to protect persons from oppressive governmental practices, shall be given in criminal prosecutions—safeguards which cannot be given in a military trial.").

Beyond separate military courts, Congress also created a military penal system distinct from the BOP, which houses offenders convicted and sentenced by federal district courts. *See* 10 U.S.C. § 951(a) (authorizing "the establishment of such military correctional facilities as are necessary for the confinement of offenders against [the UCMJ]"). This system includes confinement facilities for short-term detention, Regional Corrections Facilities, and United States Disciplinary Barracks providing "long-term incarceration for military prisoners for all services." Army Reg. 190-47 §§ 2-1 to -2 (2006). Whereas the Attorney General directly controls the BOP, military penal institutions fall outside his authority. *See* 18 U.S.C. § 4042 (describing duties of "[t]he Bureau of Prisons, under the direction of the Attorney General," but stating that "[t]his section shall not apply to military or naval penal or correctional institutions or the persons confined therein").

### B.

Having clarified the difference between the military and civilian criminal justice and penal systems, we now consider whether Joshua is "in the custody of the Bureau of Prisons" for § 4248 purposes. 18 U.S.C. § 4248(a). "When interpreting statutes we start with the plain language." *Stephens*, 565 F.3d at 137. "In interpreting the plain language of a statute, we give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *DIRECTV, Inc. v. Nicholas*, 403 F.3d 223, 225 (4th Cir. 2005) (internal quotations omitted). "[W]hen the statutory language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman*, 129 S.Ct. 681, 685 (2009). "If the language is ambiguous, in that it lends itself to more than one reasonable interpretation, our obligation is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested." *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir. 2004) (internal quotations omitted).

### 1.

The district court concluded that Joshua was not "in the custody of the Bureau of Prisons" under § 4248 upon finding that the word "custody" referred to legal custody (meaning legal authority over detention) rather than to physical custody (meaning immediate physical confinement). The only other appellate decision to address this statutory language reached the same conclusion. *See United States v. Hernandez-Arenado*, 571 F.3d 662, 667 (7th Cir. 2009) (rejecting "[a]n interpretation that would allow physical custody alone to suffice" and instead "read[ing] custody more narrowly as including all federal offenders, but not those housed in the BOP as a service to another entity which is responsible for that individual's incarceration").

Although asserting that Joshua is indeed "in the custody of the Bureau of Prisons" for § 4248 purposes, the government never defines the operative term "custody." Neither in briefing nor in response to repeated questions during oral argument has the government clarified what "custody" actually signifies. Instead, the government asserted that "custody" without dispute includes at minimum "persons serving federal criminal sentences in a Bureau of Prisons facility." Reasoning that the phrase "persons serving federal criminal sentences" would include military prisoners because the UCMJ had been enacted by Congress, the government concluded that the sole issue becomes whether Congress specifically intended to exclude military prisoners from § 4248. Declining to propose criteria for determining when the BOP has "custody," the government maintained that we need not define "custody" to determine whether § 4248 reaches Joshua.[4]

We are constrained to disagree that we can avoid defining "custody." Interpreting the phrase "in the custody of the Bureau of Prisons" obviously requires deciding what Congress meant by the word "custody." Indeed, we are obligated to interpret statutory language so that every word possesses a coherent, unabsurd meaning. *See United States v. Rippetoe*, 178 F.2d 735, 737 (4th Cir. 1949) ("[T]he rule is well settled that all laws are to be given a sensible construction and that

---

[4]On this issue the government appears disingenuous. Previously it has interpreted "custody" differently depending on the litigation. In *United States v. Comstock*, the government argued that "its ability to establish and maintain a federal criminal justice and penal system . . . renders § 4248 necessary and proper." 551 F.3d 274, 281 (4th Cir. 2009) (internal quotations omitted); *see id.* at 281 n.7 (noting argument "that § 4248 constitutes a limited, necessary extension of the federal penal system"). This implies that "custody" denotes legal authority over incarceration imposed through the federal criminal justice and penal system. In *Hernandez-Arenado*, however, the government argued "that even a person not in custody for a federal criminal offense can be included if the person is physically in a BOP facility." 571 F.3d at 666-67; *see also id.* at 666 (observing that the government argued elsewhere "that § 4248 requires only that a person be in the custody of the BOP, not that the custody is lawful").

a literal application of language which leads to absurd conse-
quences should be avoided whenever a reasonable application
can be given consistent with the legislative purpose."). Under
nearly identical circumstances, the Seventh Circuit expressed
the same opinion:

> We are entrusted with the duty to read [§ 4248] so
> as to have ascertainable meaning, and the *ad hoc*
> conclusory determination advocated by the govern-
> ment provides no guidance to courts, the ICE, the
> BOP, or those housed at BOP facilities, as to
> whether they are in the custody of the BOP for pur-
> poses of the Act. The term must be given a meaning
> that is capable of being applied beyond the narrow
> facts here, and the government is unwilling to advo-
> cate any such articulable definition.

*Hernandez-Arenado*, 571 F.3d at 667 (citing *Downey v. Crab-
tree*, 100 F.3d 662, 666 (9th Cir. 1996), for "rejecting the gov-
ernment's argument that 'nonviolent offense' should be
defined at the BOP's discretion, and noting that the federal
courts have ultimate responsibility of statutory interpreta-
tion"). We cannot simply conclude ad hoc that § 4248 reaches
Joshua without actually interpreting the applicable statutory
language, including the word "custody."

2.

We thus consider what "custody" means under § 4248,
beginning our analysis with ordinary usage. *See DIRECTV*,
403 F.3d at 225 (noting that when interpreting plain language
"we give the words of a statute their ordinary, contemporary,
common meaning . . . ." (internal quotations omitted)). As has
been suggested, the word "custody" carries two common
meanings relating to government detention. *See Rumsfeld v.
Padilla*, 542 U.S. 426, 438 (2004) (noting concerning habeas
corpus that "custody" may mean either physical or legal cus-
tody depending on context). Sometimes the word refers to

physical custody, i.e., directly limiting an individual's physical freedom. *See* Black's Law Dictionary 1263 (9th ed. 2009) (noting that "physical custody" indicates "[c]ustody of a person (such as arrestee) whose freedom is directly controlled and limited"). Other times the word refers to legal custody, i.e., having lawful authority over an individual's detention. *See id.* 442 (noting that "legal custody" indicates "[t]he detention of a person by virtue of lawful process or authority").

Because "custody" under § 4248 could mean either physical or legal custody, we must decide which definition "can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested." *Brown*, 376 F.3d at 248. Three distinct considerations suggest that the word "custody" in this context refers to legal rather than to physical custody.

First, the statute reaches any sexually dangerous person (1) "who is in the custody of the Bureau of Prisons"; (2) "who has been committed to the custody of the Attorney General pursuant to section 4241(d)" because of incompetency to stand trial; or (3) "against whom all criminal charges have been dismissed solely for reasons relating to the mental condition of the person." 18 U.S.C. § 4248(a). Because the second and third categories include only "persons who are in the federal criminal process and thus under the authority of the Attorney General as head of the Department of Justice," the first category "is consistent with those other categories if read as including those remanded to the custody of the BOP after a federal conviction." *Hernandez-Arenado*, 571 F.3d at 665; *see United States v. Fisher*, 58 F.3d 96, 99 (4th Cir. 1995) ("When interpreting a statute, rules of statutory construction require that we give meaning to all statutory provisions and seek an interpretation that permits us to read them with consistency."). Interpreting "custody" to mean physical custody would also render the second and third categories superfluous because the first category would encompass them. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 609 (1998)

("Statutory interpretations that render superfluous other provisions in the same enactment are strongly disfavored." (internal quotations omitted)); *Lane v. United States*, 286 F.3d 723, 731 (4th Cir. 2002) (noting "the basic principle of statutory interpretation instructing courts to avoid a reading which renders some words altogether redundant" (internal quotations omitted)).

Second, reading the word "custody" to mean physical custody produces absurd results that Congress could not reasonably have intended. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). Under the Memorandum, military prisoners are transferred to the BOP purely for administrative convenience. Furthermore, the BOP's website indicates that many people serving federal criminal sentences are outside the BOP's physical custody: "The Bureau is responsible for the custody and care of about 209,000 Federal offenders. Approximately 82 percent of these inmates are confined in Bureau-operated facilities, while the balance is confined in secure privately-managed or community-based facilities and local jails." BOP: About the Bureau of Prisons, http://www.bop.gov/about/index.jsp (last visited May 20, 2010). Therefore, making physical custody the touchstone under § 4248 would make the statute's applicability turn on purely administrative choices and become essentially random, excluding about 20% of federal offenders who by chance are housed outside the BOP. This approach would also permit the Attorney General to civilly commit for sexual dangerousness "those housed in BOP facilities as material witnesses, under civil contempt orders, on writs of habeas corpus *ad testificandum*, or under contract with other sovereigns . . . to house sensitive prisoners." *Hernandez-Arenado*, 571 F.3d at 666.

Third, the Supreme Court has recognized that "custody" has different meanings depending on the context. *See Padilla*,

542 U.S. at 438. The federal habeas statute 28 U.S.C. § 2242 "contemplates a proceeding against the person in immediate physical possession of the inmate, who would therefore have the power to produce that inmate if the court determined that the detention was unlawful." *Hernandez-Arenado*, 571 F.3d at 666 (citing *Padilla*, 542 U.S. at 434-35). However, "[w]here the challenged action involves a confinement that would be imposed in the future, rather than a present incarceration, custody may be defined not in terms of physical control, but rather in terms of the legal control over the person." *Id.* (citing *Padilla*, 542 U.S. at 438-39). Because § 4248 involves a determination about whether to impose future civil confinement, *Padilla* suggests that the word "custody" in this context most logically refers to ultimate legal authority over the inmate's detention. *Cf. Milhouse v. Levi*, 548 F.2d 357, 360-61 (D.C. Cir. 1976) (considering a law about persons convicted by District of Columbia courts and reasoning that because "[t]he Attorney General is . . . vested with custody over such persons throughout their entire period of incarceration," "it is clear that the 'custody' intended is not limited to actual physical custody, but denotes a type of legal custody which remains in the Attorney General even though the prisoner is assigned to an institution over which the Department of Justice has no control" (internal quotations omitted)).

These three considerations strongly suggest that "custody" under § 4248 cannot reasonably refer to physical custody.[5]

---

[5]Although *Comstock* did not directly address the word "custody," we find relevant the Court's observation that "[a]s the Solicitor General repeatedly confirmed at oral argument, § 4248 is narrow in scope." *Comstock*, 2010 WL 1946729, at *14. Furthermore, the Court's conclusion that § 4248 derives from Congress's authority to implement the federal criminal process seems inconsistent with "custody" meaning physical custody because that would expand § 4248's reach well beyond the federal criminal process, e.g., reaching state offenders housed within BOP facilities while serving their state prison sentences. *See id.* at *15 (finding § 4248 necessary and proper to "exercising the federal authority that permits Congress to create federal criminal laws, to punish their violation, to imprison

Perhaps for this reason, the government qualified its position during oral argument. It denied claiming that physical custody was the "touchstone" for § 4248 purposes and argued instead that Joshua's prison sentence was the determinative factor. The government later conceded, however, that § 4248 would be inapplicable if Joshua had never been transferred from USDB Leavenworth. Because this would make physical custody a prerequisite, the government implicitly took the position that "custody" under § 4248 requires both a prison sentence and physical custody. Such an ad hoc interpretation, however, stretches the word "custody" beyond any ascertainable meaning and cannot be reconciled with the considerations previously identified.

Various problems with the government's qualified position are immediately apparent. First, under its approach "custody" would unreasonably exclude federal offenders serving a prison sentence within a private facility under contract with the BOP. Second, because nothing in the word "custody" distinguishes between federal and state authority, "custody" would also unreasonably include state offenders serving a prison sentence from state court but "housed in BOP facilities as material witnesses, under civil contempt orders, on writs of habeas corpus *ad testificandum*, or under contract with other

---

violators, to provide appropriately for those imprisoned, and to maintain the security of those who are not imprisoned but who may be affected by the federal imprisonment of others"). This inconsistency particularly implicates our analysis given the canon of constitutional avoidance. *See FCC v. Fox Television Stations, Inc.*, 129 S.Ct. 1800, 1811 (2009) ("The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts."). Finally, the Court made various statements signaling its assumption that "custody" in this context denotes legal custody. *See Comstock*, 2010 WL 1946729, at *14 (regarding the statutory phrase "in the custody of," equating "the fact of Federal custody" with "the fact that this person has entered the criminal justice system"); *id.* (indicating that § 4248 derives from "the enumerated power that justifies the defendant's statute of conviction" (internal quotations omitted)).

sovereigns . . . to house sensitive prisoners." *Hernandez-Arenado*, 571 F.3d at 666. Third, it would make the Attorney General's civil commitment authority hinge upon the Army's choice to transfer certain military prisoners to the BOP for administrative convenience rather than for any apparent penological purpose.[6]

For all the above reasons, we conclude that under § 4248 the word "custody" refers not to physical custody or some qualified derivative but rather to legal custody. The statutory language "in the custody of the Bureau of Prisons" therefore requires the BOP to have ultimate legal authority over the person's detention.

3.

We finally consider whether the BOP has legal custody over Joshua. The district court found that the Army, not the BOP, has legal custody over Joshua because the Army retained ultimate authority over his detention. For the following reasons, we agree.

First, UCMJ Article 58's language authorizing Joshua's "confinement" within a BOP facility never transferred legal custody away from the Army. This may be understood by comparison with Title 18 sections that authorize a federal offender's commitment to the BOP. Showing language clearly bestowing legal custody, Title 18 provides that after a district court imposes a prison sentence following a conviction for violating "any Federal statute, . . . other than . . . the Uniform Code of Military Justice," 18 U.S.C. § 3551(a), the federal

---

[6]The Memorandum imposes no standards governing which military prisoners to transfer other than numerical quotas. It states that "[t]he [ ]BOP will accept and permanently maintain 500 military prisoners from Department of the Army" and also that "[m]ilitary prisoners in the custody of the [ ]BOP will not exceed 70 high security prisoners, 100 medium security prisoners, 240 low security prisoners, and 90 minimum security prisoners as classified in accordance with [ ]BOP standards." J.A. 68.

offender "shall be *committed to the custody of* the Bureau of Prisons until the expiration of the term imposed . . . ," 18 U.S.C. § 3621(a) (emphasis added). By contrast, Article 58's provision authorizing a military offender's confinement within the BOP looks much different: "a sentence of confinement adjudged by a court-martial or other military tribunal . . . may be carried into execution by *confinement in* . . . any penal or correctional institution under the control of the United States . . . ." 10 U.S.C. § 858(a) (emphasis added). That Congress chose the words "confinement in" rather than "committed to the custody of" indicates that Joshua's transfer to the BOP under the Memorandum did not remove the Army's legal custody over him. UCMJ Article 76b further demonstrates this point by displaying language that does transfer legal custody. Concerning military defendants acquitted by reason of insanity or found incompetent to stand trial, Article 76b establishes formal procedures whereby "the general court-martial convening authority may commit the person to the custody of the Attorney General." 10 U.S.C. § 876b(b)(4)(A). Accordingly, Article 58 would look more like Article 76b had Congress intended that Joshua's interagency transfer for confinement would create legal custody for the BOP. *See Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").[7]

---

[7]Beyond indicating that legal custody over Joshua remained with the Army despite transfer to the BOP, Articles 58 and 76b also undermine the government's claim about Congress's intent. Chapter 313 of Title 18, comprising §§ 4241 to 4248, authorizes hospitalization and civil commitment for criminal defendants suffering from mental disease or defect. Whereas §§ 4241 to 4244 concern defendants not yet sentenced (including those acquitted by reason of insanity or found incompetent to stand trial), §§ 4245, 4246, and 4248 concern defendants who have already been sentenced. Although § 4247(j) previously stated that all of Chapter 313 was inapplicable to military prosecutions, Congress amended it in 1997 to state that only §§ 4241 to 4244 (concerning defendants not yet sentenced) are

Second, *Hernandez-Arenado* provides persuasive authority for concluding that the BOP lacks legal custody over Joshua. There, the Seventh Circuit determined that an alien housed within a BOP facility while being detained pending deportation by the United States Immigration and Customs Enforcement (the "ICE") was not "in the custody of the Bureau of

---

inapplicable to military prosecutions. Because Congress never amended § 4247(j) again to mention § 4248 following its enactment in 2006, the government maintains that Congress must have intended that § 4248 would apply to military prisoners.

Such legislative silence, however, could also easily mean that Congress found an affirmative exception unnecessary because § 4248's statutory language does not reach military prisoners. *See Zuber v. Allen*, 396 U.S. 168, 185 (1969) ("Legislative silence is a poor beacon to follow in discerning the proper statutory route. For here the light illumines two different roads."); *see also United States v. Mitchell*, 39 F.3d 465, 469 n.6 (4th Cir. 1994) ("Silence is an unreliable source of legislative intent."). The precise dynamic between Chapter 313 and Articles 58 and 76b supports this conclusion. Enacted the year before § 4247(j)'s amendment, Article 76b provides detailed procedures for hospitalizing and civilly committing military defendants found incompetent to stand trial or acquitted for lack of mental responsibility. Regarding a defendant found incompetent to stand trial, it states that the court-martial "shall commit the person to the custody of the Attorney General," who shall hospitalize the person under § 4241(d) and, once deemed necessary, shall civilly commit him under § 4246. 10 U.S.C. § 876b(a). Regarding a defendant acquitted for lack of mental responsibility, Article 76b states that the court-martial shall conduct a hearing pursuant to § 4243(b)-(d) and then "may commit the person to the custody of the Attorney General," who shall hospitalize him under § 4243(e). 10 U.S.C. § 876b(b). By demonstrating Congress's elaborate mechanism for bringing military defendants into Chapter 313, including a formal transfer of legal custody, Article 76b belies the suggestion that Congress intended to bring military prisoners into § 4248 through Article 58, which does not transfer legal custody but merely authorizes "confinement in" the BOP. Instead, Congress most likely understood that, whereas §§ 4241-4244's broad statutory language (reaching any "defendant") would reach military defendants without § 4247(j)'s exception, Chapter 313's sections that authorize post-sentencing civil commitment, §§ 4246 and 4248, contain narrower statutory language that (unless trigged by Article 76b) does not reach military prisoners.

Prisons" under § 4248 because the BOP lacked legal custody over him. 18 U.S.C. § 4248(a). The court reasoned that the defendant "[wa]s housed at BOP facilities for the convenience of the ICE, and although the BOP attend[ed] to his daily needs and may even [have] transfer[red] him among facilities to further its own interests, the ICE retain[ed] the ultimate authority over him." *Hernandez-Arenado*, 571 F.3d at 667.

The government argues that *Hernandez-Arenado* may be distinguished from this case because that defendant was not serving a prison sentence. Although the *Hernandez-Arenado* defendant indeed was not serving a prison sentence, that fact was irrelevant to the decision. The Seventh Circuit relied instead on the fact that the ICE, and not the BOP, had ultimate authority over the defendant. In this regard, the instant case seems indistinguishable from *Hernandez-Arenado*. Although the BOP exercises authority over Joshua's everyday activities and circumstances, the Memorandum states that military prisoners within BOP facilities remain "in permanent custody of the U.S. Army," which "retain[s] clemency authority."[8] J.A. 68-69. Accordingly, the BOP considers them "[c]ontractual boarders" comparable to its "State . . . inmates," making them ineligible for early release following treatment for drug abuse. 28 C.F.R. § 550(b)(3). We therefore conclude that, like the *Hernandez-Arenado* defendant, Joshua is "housed in the BOP as a service to another entity which is responsible for [his] incarceration." *Hernandez-Arenado*, 571 F.3d at 667.

---

[8]We observe that, even after Joshua's discharge, the Army retained authority to prosecute him by court-martial for military offenses committed while still a military prisoner. *See Kahn v. Anderson*, 255 U.S. 1, 7-8 (1921) ("[A]s [petitioners] remained military prisoners they were for that reason subject to military law and trial by court-martial for offenses committed during such imprisonment."); *Carter v. McClaughry*, 183 U.S. 365, 383 (1902) ("[Petitioner] was a military prisoner though he had ceased to be a soldier; and for offenses committed during his confinement he was liable to trial and punishment by court-martial.").

For the above reasons, we conclude that Joshua is not "in the custody of the Bureau of Prisons" under § 4248 because the BOP does not have legal custody over him. 18 U.S.C. § 4248(a). Accordingly, we affirm the district court's order dismissing the government's petition for civil commitment.

### III.

Joshua has been incarcerated over 15 months longer than he should have been, a situation that might have been avoided had the government not waited until 8 days before Joshua's scheduled release before seeking civil commitment.

*AFFIRMED*